

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-12-00219-CV

Thomas A. **LAMONT**, L.O.G. Energy Development, Ltd.,
Rosendo A. Carranco, and Montecristo Energy II, Ltd.,
Appellants

v.

**VAQUILLAS ENERGY LOPENO LTD., LLP** and
JOB Energy Partners II, Ltd.,
Appellees

From the 49th Judicial District Court, Webb County, Texas
Trial Court No. 2008-CVF000353D1
Honorable Jose A. Lopez, Judge Presiding

Opinion by:    Patricia O. Alvarez, Justice

Sitting:    Sandee Bryan Marion, Justice
Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed:  December 11, 2013

AFFIRMED

On October 23, 2013, Appellants filed a Motion for Rehearing.  The motion is denied.  We withdraw our opinion and judgment dated September 18, 2013, and substitute the following opinion and judgment in their place.

This appeal arises from a dispute over whether a seismic map of a gas prospect constitutes a trade secret and whether it was acquired through improper means.  The jury found that Appellants

misappropriated the map, intentionally interfered with contractual relations, and conspired to do so. We affirm the trial court's judgment.

## BACKGROUND

In 1996, Jerry Hamblin and Thomas Lamont formed Ricochet Energy, Inc., an oil and gas development company. Hamblin and Lamont each owned 50% of the shares and were the only directors of the company. Hamblin served as the company's president from 1998–2006; in 2005, Lamont was elected chief operating officer. Hamblin spent the majority of his time at Ricochet, while Lamont spent the majority of his time working at Howland Engineering and Surveying Co., his separate engineering firm.

In 2003 and 2004, Ricochet entered into Prospect Generation Agreements (PGAs) with Vaquillas Energy Lopeno Ltd., LLP and JOB Energy Partners II, Ltd. whereby Ricochet agreed to generate oil and gas prospects. In turn, Vaquillas and JOB agreed to pay Ricochet monthly fees to cover Ricochet's overhead while looking for prospects. The PGAs required Ricochet to (1) identify oil and gas prospects in Texas and (2) present prospects with seismic maps to Vaquillas and JOB for their first right of refusal for exploration and development. The agreement also vested Vaquillas and JOB with a proprietary interest in all acquired or generated data and interpretations of any accepted prospects.

Once a prospect was accepted, Vaquillas and JOB determined their commitment by electing their working-interest percentage. The remaining percentage was either retained by Ricochet or sold to other working-interest investors. When all of the working-interest percentages were sold, a Joint Operating Agreement was executed by all the working-interest owners and Ricochet. Under the PGAs, Ricochet maintained sole discretion to acquire a lease within the identified prospect. Although Lamont neither signed nor negotiated the PGAs with Vaquillas and JOB, the agreements were ratified through Ricochet's corporate minutes.

*Discovery of the Lopeno Prospect*

Sometime in September of 2004, Chris Maier, Ricochet's geologist, identified the Lopeno Prospect gas reservoir. The reservoir was approximately 161 acres in size, contained between ten billion and twelve billion cubic feet of gas, and had an estimated value of between $40 million and $60 million. The Lopeno Prospect was located in Zapata County beneath two contiguous tracts of property—the Worley property and the El Milagro property. Maier prepared the following seismic map of the Lopeno Prospect for Ricochet.[1] The map was commonly referred to by the parties as the "Treasure Map."

*Lopeno Prospect Treasure Map*



El Milagro lease

Worley lease

Lopeno Prospect Gas Reserve

---

[1] The seismic map was continuously updated throughout the development of the Lopeno Prospect. This map was offered and admitted into evidence, without objection, as part of Plaintiffs' exhibit #11.

Hamblin and Lamont first met with Vaquillas and JOB to discuss the Lopeno Prospect in September of 2005. The Lopeno Prospect Treasure Map was used to show the size and potential of the gas reservoir. Vaquillas agreed to participate as a 20% working-interest owner and JOB agreed to participate as a 15% working-interest owner. Ricochet retained the remaining percentage of the working-interest in the Lopeno Prospect. Ricochet then moved to acquire leases over the surface properties. Because the El Milagro property was in litigation over a previous lease, Ricochet elected to lease the Worley property for drilling purposes.

While the Lopeno Prospect was being developed, regular meetings were held by Ricochet to discuss various aspects of the prospect with Vaquillas and JOB, including the seismic information that Maier continued to develop. All parties agree the meetings were confidential and seismic information relating to the Lopeno Prospect, including the Treasure Map, was kept secret. Lamont, as an officer of Ricochet, attended these meetings either in person or by phone. Ricochet further protected the Lopeno Prospect Treasure Map by only showing it to oil and gas working-interest investors. There is no evidence that the Treasure Map was made public.

*Lamont Separates from Ricochet*

In August of 2006, Lamont notified Hamblin that he wanted to separate from Ricochet. In early 2007, while Lamont and Hamblin began negotiations on Lamont's voluntary separation from Ricochet, drilling on the Worley Gas Unit No. 1 began. Vaquillas and JOB continued paying Ricochet pursuant to the PGAs. During the negotiations, Lamont had access to Ricochet computers, keys, seismic data, and offices. Lamont and Hamblin ultimately negotiated two separation agreements: (1) an agreement dividing Ricochet's oil and gas prospects, and (2) a Master Agreement to Sell, Transfer, Assign and/or Dissolve Certain Business Interests. The agreements were dated February 15, 2007, executed on February 16, 2007, and made retroactive to December 31, 2006. Also on February 16, 2007, Lamont tendered his resignation as director,

officer, and chief operating officer retroactively to December 31, 2006. Pursuant to the separation agreement, Lamont could review any seismic data and could participate in the prospects. On February 16, 2007, Lamont signed a Joint Operation Agreement for the Lopeno Prospect as a 29% working-interest owner.

Based on the seismic data and the Ricochet "staff meetings," Lamont was privy to the following information regarding the Lopeno Prospect: (1) the size of the Lopeno Prospect gas reservoir (including the estimated ten billion to twelve billion cubic feet of gas it contained and the estimated value of between $40 million and $60 million); (2) the division of the properties and the boundaries of the gas reservoir; and (3) Ricochet's placement of its first well on the Worley property, approximately 478 feet, "as close as legally possible," to the El Milagro property line.

*Lamont and Carranco Meetings*

In January of 2007, Lamont met with Rosendo Carranco, a CPA and experienced oil and gas investor with thousands of acres under lease in South Texas. Lamont informed Carranco of his plans to leave Ricochet. Before February 5, 2007, Lamont again met with Carranco. At this second meeting, Lamont notified Carranco of his 29% working-interest in the Lopeno Prospect and offered Carranco 10% of that interest.

On February 5, 2007, per Hamblin's instructions, Maier e-mailed a copy of the Lopeno Prospect Treasure Map to Lamont at his Ricochet e-mail address.[2] Lamont asserts that because he did not have access to his Ricochet account at his residence, he forwarded the e-mail to his personal Gmail account. Lamont alleges Hamblin knew Lamont was trying to sell part of his working-interest in the Lopeno Prospect and that Hamblin knew Lamont wanted to show the Treasure Map to Carranco to entice him to become a working-interest investor. Hamblin

---

[2] We note that Plaintiffs' exhibits 11 and 22 were both admitted into evidence and represent different segments of the Treasure Map developed by Ricochet regarding the Lopeno Prospect.

acknowledges he understood that Lamont was considering retaining his 29% working-interest in the Lopeno Prospect. The record shows that Lamont signed the Lopeno Prospect Joint Operating Agreement as a working-interest owner on February 16, 2007, eleven days after Maier sent him the Treasure Map.

On February 22, 2007, Lamont and Carranco met again. This time Lamont provided Carranco with seismic maps of four different prospects, including the Lopeno Prospect Treasure Map. In turn, Carranco gave Lamont a check in the amount of $65,592.00 for 10% of Lamont's interest on each prospect. On March 14, 2007, almost three weeks later, Lamont notified Ricochet that one of Carranco's companies, Crazy Horse, had purchased 10% of Lamont's 29% working-interest ownership in the Lopeno Prospect. On February 27, 2007, Lamont received a copy of the well log for Worley No. 1 and shared the findings with Carranco. Carranco testified that based on the Worley log, and no other seismic data, he quickly realized the importance of leasing the El Milagro property. At the end of February, without any "seismic data," both Lamont and Carranco began efforts to lease the El Milagro property under the name of Montecristo Energy II. Later, Ricochet also began negotiating a lease for the El Milagro property. Ricochet, however, was unaware of Lamont's involvement in Montecristo II.

Throughout the spring and summer of 2007, under the name Montecristo Energy II, Lamont and Carranco negotiated against Ricochet for a lease on the El Milagro property. Although the El Milagro lease grew in size from 108 acres to 1500 acres, and the bonus continued to increase, prior to June of 2007, neither Lamont nor Carranco took steps to obtain additional seismic data showing where the reservoir was truly located. On June 4, L.O.G. hired David Miller and Lamont instructed Miller to concentrate his research on the El Milagro property. On June 11, 2007, only one week after hiring Miller, Lamont conveyed an offer regarding the El Milagro property, including an up-front, cash bonus in excess of $600,000.00. Three days later, Lamont signed an

agreement with Seismic Associates to obtain a seismic map of the El Milagro Property. After Ricochet withdrew its final lease offer over a potential lease on the El Milagro property, Montecristo II successfully obtained the El Milagro lease, paying an up-front bonus exceeding $1 million. Shortly thereafter, Montecristo II assigned 60% working-interest in three wells on the El Milagro lease to L.O.G. Energy Development, Ltd., owned by Lamont. In direct competition with Ricochet's attempts to pull the gas from the reservoir, L.O.G. began drilling the well identified as El Milagro No. 1. During the next six months, L.O.G. depleted the Lopeno Prospect gas reservoir, thereby preventing Ricochet from withdrawing the same.

Appellees Vaquillas and JOB sued Appellants Carranco, Lamont, L.O.G. and Montecristo II for misappropriation of trade secrets, tortious interference with contractual relations, and conspiracy. The jury returned a verdict in favor of Appellees. The jury found that Appellants misappropriated the Lopeno Prospect Treasure Map, intentionally interfered with the PGAs, and conspired to do so. Appellants appeal the verdict.

### APPELLANTS' ISSUES ON APPEAL

In the present case, the same facts apply to both theories of liability and to the award of damages. Although repetitive at times, we will address pivotal facts applicable to each issue. Further, for simplicity and organizational purposes, Appellants' issues are reordered as follows: (1) evidence is legally and factually insufficient to support the jury's findings that Appellants misappropriated Appellees' trade secrets; (2) evidence is legally and factually insufficient to support the jury's findings that Appellants tortiously interfered with the agreements between Ricochet and Appellees; (3) the jury's finding on Appellants' defenses of legal justification or privilege is not supported by the evidence; (4) evidence was legally and factually insufficient to support the jury's findings that Appellants participated in a conspiracy that damaged Appellees; (5) the trial court committed harmful and reversible error by submitting to the jury an incorrect

definition of "proximate cause"; and (6) evidence was legally and factually insufficient to support the jury's award of $4.9 million to Appellees for alleged lost profits when Appellees' damage calculation assumed that, in the absence of Appellants' conduct, no operator would have drilled any wells on the El Milagro property.[3]

### STANDARD OF REVIEW

Legal sufficiency challenges may be sustained only

> when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact."

*City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (quoting Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)); *accord Rosas v. Comm'n for Lawyer Discipline*, 335 S.W.3d 311, 316 (Tex. App.—San Antonio 2010, no pet.). "If 'the appellant is challenging the legal sufficiency of the evidence to support a finding on which [he] did not have the burden of proof at trial, the appellant must demonstrate on appeal that no evidence exists to support the adverse finding.'" *Rosas*, 335 S.W.3d at 316 (alteration in original) (quoting *Bellino v. Comm'n for Lawyer Discipline*, 124 S.W.3d 380, 385 (Tex. App.—Dallas 2003, pet. denied)). The evidence is legally sufficient if "more than a scintilla of evidence exists." *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001); *Cumpian v. Pan Am. Express, Inc.*, 147 S.W.3d 515, 516–17 (Tex. App.—San Antonio 2004, no pet.). "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. &*

---

[3] Because we overrule Appellants' arguments with regard to lost profits, we need not address Appellees/Cross-Appellants' Cross Appeal.

*Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009) (quoting *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006)); *accord Lee Lewis Const., Inc.*, 70 S.W.3d at 782–83.

A factual sufficiency challenge concedes the existence of conflicting evidence, "yet maintain[s] that the evidence against the jury's findings is so great as to make the finding erroneous." *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275 (Tex. App.—Amarillo 1988, writ denied); *accord Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 49 (Tex. App.—San Antonio 2006, no pet.). In reviewing the record for a challenge to the factual sufficiency of the evidence, the court of appeals must consider and weigh all the evidence in the record. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam). The court must "keep[] in mind that it is the jury's role, not [the court's], to judge the credibility of the evidence, to assign the weight to be given to testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony." *Walker v. Ricks*, 101 S.W.3d 740, 749 (Tex. App.—Corpus Christi 2003, no pet.); *see Corpus Christi Area Teachers Credit Union v. Hernandez*, 814 S.W.2d 195, 197 (Tex. App.—San Antonio 1991, no writ).

**MISAPPROPRIATION OF TRADE SECRET**

The elements of a claim for misappropriation of a trade secret are "(1) the trade secret existed; (2) the trade secret was acquired through breach of a confidential relationship or was discovered by improper means; (3) the defendant used the trade secret without authorization; and (4) [the plaintiff] suffered damages as a result." *Twister B.V. v. Newton Research Partners, LP*, 364 S.W.3d 428, 437 (Tex. App.—Dallas 2012, no pet.); *Rusty's Weigh Scales & Serv., Inc. v. N. Tex. Scales, Inc.*, 314 S.W.3d 105, 109 (Tex. App.—El Paso 2010, no pet.). On appeal, Appellants challenge only the first two elements.

**A. Trade Secret**

If the subject matter appropriated by the defendant is not a trade secret, there is no liability for misappropriation, no matter how reprehensible the defendant's conduct. *See Stewart & Stevenson Servs., Inc. v. Serv-Tech, Inc.*, 879 S.W.2d 89, 96 (Tex. App.—Houston [14th Dist.] 1994, writ denied). A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 776 (Tex. 1958); *accord In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (orig. proceeding) (quoting *Computer Assocs. Int'l v. Altai*, 918 S.W.2d 453, 455 (Tex. 1994)).

Secrecy is a key part in the definition of a trade secret. *See H.E. Butt Grocery Co. v. Moody's Quality Meats, Inc.*, 951 S.W.2d 33, 35 (Tex. App.—Corpus Christi 1997, pet. denied). The owner of a trade secret must take reasonable precautions to protect the trade secret. *J.C. Kinley Co. v. Haynie Wire Line Serv. Inc.*, 705 S.W.2d 193, 196–98 (Tex. App.—Houston 1985, writ ref'd n.r.e.). A trade secret is not necessarily destroyed by a disclosure; but, in disclosing a trade secret, the owner must establish a confidential relationship with the other party, by contract or otherwise, or the secret will be lost by the disclosure. *Furr's, Inc. v. United Specialty Adver. Co.*, 385 S.W.2d 456, 459 (Tex. App.—El Paso 1964, writ ref'd n.r.e.). Courts refuse to extend "trade secret protection when the material . . . sought to be protected has been publicly disclosed." *Gonzales v. Zamora*, 791 S.W.2d 258, 264 (Tex. App.—Corpus Christi 1990, no writ); *see also Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 467 (Tex. App.—Austin 2004, pet. denied).

The parties agree the extensive amount of work and the over $1 million invested in analyzing and developing the Lopeno Prospect Treasure Map elevated the seismic map to a trade secret. Appellants, however, argue the trade secret status of the Treasure Map was destroyed by

Ricochet. The question before this court is whether the map lost its trade secret status in light of Ricochet's failure to require confidentiality agreements and by showing the map to potential investors.

*1. Arguments by the Parties*

Appellants claim the Treasure Map lost its "trade secret" protections when (1) Hamblin voluntarily instructed Maier to e-mail the map to Lamont after the effective date of his resignation, (2) Ricochet voluntarily disclosed the map to third parties, and (3) Ricochet failed to take steps to ensure the map remained confidential.

Appellees, on the other hand, claim Ricochet showed the Lopeno Prospect Treasure Map to Lamont only for the limited purpose of negotiating his agreement and electing his percentage of working-interest in the Lopeno Prospect. Appellees also claim the Treasure Map was shown only to potential Lopeno Prospect working-interest investors. Therefore, the trade secret status of the map was not destroyed. We agree with Appellees for the following reasons.

*2. Was the Treasure Map's Trade Secret Status Destroyed?*

In our analysis, we consider the direct testimony and the circumstantial evidence. Without objection from Appellants, the jury charge included the following instruction:

> A fact may be established by direct evidence or circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

The parties agree that Hamblin voluntarily directed Maier to e-mail the Treasure Map to Lamont. At the time the map was e-mailed, the evidence is uncontroverted that Hamblin was acting in his capacity as a Ricochet officer. The disagreement focuses on Lamont's capacity at the time the Treasure Map was e-mailed to him.

When negotiating his separation from Ricochet, Lamont went to great lengths to ensure his resignation became effective on December 31, 2006. Relying on the retroactive clause in the Master Agreement, Lamont claims he had no duty to protect Ricochet or its assets after the effective date of his resignation. He argues that in the absence of a duty, Ricochet's release of the Treasure Map by e-mail effectively destroyed its trade secret status.

Appellees strongly disagree. They argue that at trial, Hamblin was adamant that when he authorized Maier to provide Lamont access to the map, he considered Lamont an officer, director, and chief operating officer of Ricochet and bound by the duties associated therewith. Hamblin testified the Treasure Map was kept quiet and that none of Ricochet's competitors knew of the map's existence. Although Ricochet did not have confidentiality agreements with its employees, Hamblin explained that it was to the benefit of the employees to keep the Treasure Map's existence secret. Hamblin also explained the Treasure Map was provided to Lamont for Lamont to determine whether to participate *with Ricochet* in the Lopeno Prospect as a working-interest owner. Neither Ricochet nor Hamblin ever gave Lamont consent or authority to *take* the Treasure Map or to use the map to *compete against the Lopeno Prospect*.

Appellants' argument ignores a long tradition of Texas law forbidding employees "from using trade secret information acquired during the employment relationship in a manner adverse to [their] employer, and this obligation survives the termination of employment." *Reliant Hosp. Partners, LLC v. Cornerstone Healthcare Grp. Holdings, Inc.*, 374 S.W.3d 488, 499 (Tex. App.— Dallas 2012, pet. filed) (citing *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 424 (Tex. App.— Houston [14th Dist.] 2007, no pet.)); *see Sands v. Estate of Buys*, 160 S.W.3d 684, 687 (Tex. App.—Fort Worth 2005, no pet.); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 21–22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd). After Lamont resigned his position at Ricochet, regardless of the effective date, Lamont's duty to protect the trade secret

information survived. *See, e.g.*, *Reliant Hosp. Partners*, 374 S.W.3d at 499. Lamont did not have authority to destroy the trade secret status of the Treasure Map, even after his resignation became effective. *See, e.g.*, *id.*

Appellants also claim that Ricochet showed the Treasure Map to potential working-interest investors, including Lamont, and vitiated the map's trade secret protections. Trade secret status is not destroyed simply by showing the protected item to prospective buyers, customers, or licensees. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 41 cmt. b (1995); *see also H.E. Butt Grocery Co.*, 951 S.W.2d at 36. Lamont was a prospective investor when Maier e-mailed him the map. Lamont asserts that same argument when he attempts to defend his actions of showing the Treasure Map to Carranco by claiming that Carranco was a prospective investor. We conclude that Ricochet's limited disclosure to Lamont and other potential investors did not destroy the secrecy of the Treasure Map. *See Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir. 1986) (holding that secrecy was not destroyed by limited communication in furtherance of the owner's economic interests).

*3. Conclusion*

Based on the evidence presented at trial, we conclude the evidence is legally and factually sufficient to support jury's determination that the Lopeno Prospect Treasure Map maintained its status as a trade secret. Ricochet acted to protect its trade secret, and Appellants' actions and secrecy confirm their knowledge of the map's value. We conclude there is sufficient evidence to support the jury's finding that the Lopeno Prospect Treasure Map was, at all times, a trade secret.

We now turn to the second element of the misappropriation of trade secrets claim: acquisition of the trade secret by improper means.

**B. Discovery of Trade Secret by Improper Means**

A misappropriation of trade secrets claim requires proof that the defendant either (1) "discovers the secret by improper means, or [(2)] his disclosure or use[, after properly acquiring knowledge of the secret,] constitutes a breach of the confidence reposed in him." *Hyde Corp.*, 314 S.W.2d at 769 (quoting RESTATEMENT (FIRST) OF TORTS § 757 (1939)); *see also Twister B.V.*, 364 S.W.3d at 438. Appellants challenge only the question of "improper means."

The trial court instructed the jury on "improper means" as follows:

> For the defendant to have acquired knowledge of a trade secret "by improper means," the defendant must have known or had reason to know that the information was a trade secret. A person discovers another's trade secrets through "improper means" by acting below the generally accepted standards of commercial morality and reasonable conduct.

> A Defendant does not acquire knowledge of a trade secret by improper means if it discovers the plaintiff's trade secret by independent development or independent discovery.

Because there was no objection to the charge, our analysis is limited to whether Lamont and Carranco are liable for using a trade secret if the trade secret was discovered by improper means. *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 68, 71 (Tex. 2000) (holding legal and factual sufficiency is measured against the jury instruction).

*1. Discovery by Improper Means*

Texas courts "condemn the employment of improper means to procure trade secrets." *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 424 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing *Am. Precision Vibrator Co. v. Nat'l Air Vibrator Co.*, 764 S.W.2d 274, 277 (Tex. App.—Houston [1st Dist.] 1988, no writ)). In *E.I. duPont deNemours & Co. v. Christopher*, the court concluded "A complete catalogue of improper means is not possible. In general they are means which fall below the generally accepted standards of commercial morality and reasonable conduct." *E.I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1015–16 (5th Cir. 1970)

(applying Texas law).  Almost thirty years later, the Fifth Circuit acknowledged the same hardship still applies and looked at the evidence in light of the reasonable jury.  *See Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 785 (5th Cir. 1999) (concluding the jury could have found the defendant's conduct violated commercial standards of morality and reasonable conduct when the defendant mislead an individual to make unlawful copies of operating system software and then used the knowledge to interpret the trade secrets).

"Independent discovery and analysis of publicly available products or information are not improper means of acquisition."  RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 43 (1995).  However, "[t]he acquisition of a trade secret can be improper even if the means of acquisition are not independently wrongful."  *Id.* § 43 cmt. c.  The mere fact that knowledge of a trade secret may be acquired through lawful means, such as inspection or analysis, does not preclude protection as a trade secret from those who secure that knowledge through improper means.  *Sharma*, 231 S.W.3d at 424 (citing *K&G Oil Tool & Serv. Co. v. G&G Fishing Tool Serv.*, 314 S.W.2d 782, 788 (Tex. 1958)).  Here, "[t]he question is not 'How could [Lamont and Carranco] have secured the knowledge?' but 'How did [they]?'"  *Id.* (quoting *Am. Precision Vibrator Co.*, 764 S.W.2d at 277).

*2.  Arguments by the Parties*

Appellants argue the Lopeno Prospect Treasure Map was voluntarily provided to Lamont when he was no longer an officer, director, or chief operating officer of Ricochet, and because Lamont had the right to access and review seismic data by virtue of his role as an owner of a working-interest, there was nothing improper in his use of the Treasure Map.  Appellants reason that if Lamont acquired the map properly, so did Carranco and Montecristo II.  Appellants also argue that they did not rely on the Treasure Map to lease and then drill on the El Milagro property.  Instead, they relied on the Worley No. 1 log obtained through proper means.

Appellees argue that, in acquiring the map, Lamont deceived Ricochet and Appellees in how the map would be used. They contend that the Treasure Map was the only seismic information confirming the existence of gas under the El Milagro property when Appellants began negotiating the lease for that property. They conclude that Appellants' use of the map to lease and drill El Milagro fell below generally accepted standards of commercial morality and reasonable conduct.

### 3. Analysis

Our inquiry focuses on how Carranco and Lamont obtained knowledge of the presence of gas under the El Milagro property. *See Sharma*, 231 S.W.3d at 424. Our fact pattern is analogous to *Southwestern Energy Production Co. v. Berry–Helfand*, No. 12-11-00370-CV, 2013 WL 3461644 (Tex. App.—Tyler July 10, 2013, no pet. h.). In *Southwestern Energy*, Helfand and her partners studied the production history for six hundred oil wells in a six county area. *Id.* at *12. Based on the extensive data she collected, Helfand identified ten "sweet spots," or areas she considered to be the most favorable for production. *Id.* Although Helfand and her company shared the material with other prospective oil and gas operators, the information was disclosed only under confidentiality agreements. *Id.* The defendant claimed its in-house study only coincidentally led to drilling in Helfand's sweet spots, but the jury disagreed. *Id.* at *13, *15. The *Southwestern Energy* court looked at the defendant's failure to have ever drilled in the area prior to reviewing Helfand's work, and its zealous pursuit of opportunities after such review, and concluded the defendant's wells consistently overlapped with Helfand's sweet spots. *Id.* at *13. Based on the defendant's spectacular success rate, and the lack of other seismic data, the jury could have reasonably disregarded the defendant's explanation that it threw away all copies of such a significant study. *Id.* at *15.

Here, the record shows that while he was a Ricochet officer and director, Lamont became familiar with the seismic information of the Lopeno Prospect. While negotiating his separation

from Ricochet, and in order to make an informed decision on the division of assets, Lamont had the right to review the seismic information. Likewise, assuming the use was for the Worley wells, both Carranco and Lamont, as potential investors, could properly review the seismic map when deciding whether they wanted to participate as working-interest owners in the Lopeno Prospect. Appellants review of the Treasure Map was proper solely for the purpose of deciding whether to invest in the ***Worley wells***; it was not proper for drilling wells on the El Milagro property in competition with Ricochet's wells. *See Reliant Hosp. Partners*, 374 S.W.3d at 499; *Sharma*, 231 S.W.3d at 424.

Lamont's and Carranco's activities after Lamont obtained the Treasure Map from Ricochet are significant in our analysis. Lamont gave Carranco the map on February 22, 2007, and they received the Worley No. 1 well log on February 27, 2007. The ***following day*** they contacted the El Milagro property owners to inquire about leasing their property. Moreover, even though Carranco paid Lamont for 10% of Lamont's working-interest in the Lopeno Prospect on February 22nd, Lamont intentionally waited until March 14, 2007 to inform Ricochet of Carranco's interest.

Even further, Montecristo II was formed for the purpose of leasing the El Milagro property. In order to secure the bank loan necessary to pay the working-interest for some of the El Milagro wells, Lamont wrote a letter to the bank assuring it of the Lopeno Prospect gas reservoir's value. The information in Lamont's letter came directly from Ricochet and Appellee's seismic data and Treasure Map. Carranco formed Montecristo II without Lamont's identity being disclosed in any of the documentation. Months later, after the El Milagro lease was secured, but prior to drilling on the El Milagro leasehold, Montecristo II assigned 60% of the working-interest in the El Milagro lease to L.O.G., Lamont's energy development company.

Appellees contend the foregoing activities show Appellants' misappropriation of the Treasure Map. Lamont and Carranco insist the Treasure Map did not affect their decision to lease

and drill the El Milagro property. During trial, both testified that the Worley log (acquired by them through proper means), and not the Treasure Map, contained the crucial information in their decision to lease the El Milagro property. Lamont acknowledged the Worley log was incredibly valuable because the log reveals the depth of the sand in the well. In his experience, if the sand thickness measures less than twenty feet, the well will be a dry hole. Lamont further explained that the sand on a typical well in Zapata County is approximately forty to fifty feet thick; the Worley No. 1, however, measured the sand thickness at 225 feet. The well was also testing at an extraordinary 10 million cubic feet of gas per day. Based on these numbers, and "without any seismic data," Lamont and Carranco contend they made the decision to lease and then drill the El Milagro property.

Appellees contend the evidence shows the Lopeno Prospect Treasure Map was an essential part of Montecristo II leasing the El Milagro property and L.O.G.'s timing and placement of the wells. Although Lamont emphasizes the unusual thickness of the sand layer on Worley No. 1, the only information the Worley No. 1 log provided was the sand depth *on the Worley property* and, more specifically, the land directly next to Worley No. 1. Appellees argue that contrary to Lamont's testimony, the Worley log provided no information regarding sand depth *on the El Milagro property*.

Based on the evidence, we conclude it was not unreasonable for the jury to determine that Appellants improperly used the Treasure Map. The evidence shows that both deceived Ricochet and Appellees on how the treasure map was to be used by them. We likewise conclude that it was not unreasonable for the jury to determine the Treasure Map, and not the Worley No. 1 log, contained seismic information that motivated Appellants to undertake million-dollar negotiations for the El Milagro lease or expend the millions of dollars necessary to develop the wells in that lease. Because neither Lamont nor Carranco had authority from Ricochet or Hamblin to use the

Treasure Map to locate gas in the El Milagro property, it was not unreasonable for the jury to determine Appellants misused the map to locate the El Milagro wells and in doing so, their actions fell "below the generally accepted standards of commercial morality and reasonable conduct." *See Christopher*, 431 F.2d at 1015–16; *Sharma*, 231 S.W.3d at 424.

It is noteworthy that neither Carranco nor Lamont conducted any independent research of the gas reservoir. Obtaining knowledge of a trade secret without spending time and resources to discover it independently is improper unless the secret is voluntarily disclosed or reasonable precautions to ensure its secrecy are not taken. *Christopher*, 431 F.2d at 1015–16 (applying Texas law).

> One may use his competitor's secret process if he discovers the process by reverse engineering applied to the finished product; one may use a competitor's process if he discovers it by his own independent research; but one may not avoid these labors by taking the process from the discoverer without his permission at a time when he is taking reasonable precautions to maintain its secrecy.

*Id.*; *see also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 43 (1995).

Here, Ricochet's geologist, Maier, collected an extensive amount of seismic data to create the Lopeno Prospect Treasure Map. Maier's analysis and details contained within the Treasure Map evolved over a period of several years and at great expense to Appellees. The testimony at trial clearly shows that individuals within the oil and gas industry would not bid for leases without seismic mapping or data to indicate what is below the leased property. Through Maier's seismic analysis and work, specific boundaries of the Lopeno Prospect were identified and directed Ricochet as to where to place its wells. Because gas reservoirs do not follow property lines, without seismic data as to where the reservoir was located, be it on the Worley property or the El Milagro property or both, any well placement would be highly speculative. Absent any seismic analysis or work on the El Milagro property, it was not unreasonable for the jury to conclude that

Appellants' knowledge of the gas beneath the El Milagro property was obtained through the unauthorized use of the Treasure Map.

### 4. Conclusion

Like the defendant in *Southwestern Energy*, Carranco and Lamont insist their determination to lease the El Milagro property was based solely on the Worley No. 1 log, and not on the Lopeno Prospect Treasure Map. Yet, while claiming they did not use the map, or any additional seismic data, Carranco and Lamont offered over $1 million to lease the El Milagro property, drilled wells on it, and drained the reservoir within six months.

Although Lamont used proper means to review the Treasure Map as a working-interest owner in the Lopeno Prospect, the evidence shows Appellants used the map to the detriment of Ricochet, Lamont's former employer. *See Reliant Hosp. Partners*, 374 S.W.3d at 499. Montecristo II ultimately paid more than $1 million to lease over 1,500 acres, but the location of the L.O.G. wells were limited to the 108 acres identified as the Lopeno Prospect gas reservoir on the Treasure Map. A jury could reasonably believe these decisions were tied to Appellants' possession of the map. The jury could also reasonably believe that Lamont's reason for possessing the map was not only to sell a portion of his working-interest in the Lopeno Prospect to Carranco, but to use the information contained on the map as a basis for Appellants' lease of, and drilling on, the El Milagro property.

Based on a review of the entire record, we conclude that the evidence is legally and factually sufficient to support the jury's determination that Appellants procured the Treasure Map by improper means. Accordingly, because the evidence supports the jury's misappropriation findings, we overrule Appellants' issues challenging the evidence's legal and factual sufficiency.

## TORTIOUS INTERFERENCE

We turn to Appellants' arguments based on the jury's findings related to tortious interference with an existing contract. To recover damages on a claim for tortious interference with a contract, a plaintiff must prove "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Newman v. Kock*, 274 S.W.3d 697, 702 (Tex. App.—San Antonio 2008, no pet.) (citing *Holloway v. Skinner*, 898 S.W.2d 793, 795–96 (Tex. 1995)).

"To establish tortious interference with [an] existing contract, a plaintiff is not limited to showing the contract was actually breached." *Khan v. GBAK Props., Inc.*, 371 S.W.3d 347, 359–60 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (citing *Hughes v. Hous. Nw. Med. Ctr., Inc.*, 680 S.W.2d 838, 842 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.)). "Any interference that makes performance more burdensome or difficult or of less or no value to the one entitled to performance is actionable." *Id.*

### A. Arguments of Parties

Appellants argue the PGAs required Ricochet to identify oil and gas prospects in exchange for payment. Because there was no evidence the PGAs were breached, Appellees were required to prove that Appellants acted in a way that made performance of the PGAs more burdensome or expensive to Appellees, not more expensive to Ricochet. *See Tippett v. Hart*, 497 S.W.2d 606, 610 (Tex. Civ. App.—Amarillo 1973, writ ref'd n.r.e.) (requiring the plaintiff to prove that performance of the contract was more burdensome or expensive to the plaintiff). Appellants further argue there is no evidence that Appellants intended to cause a breach of the PGAs or that they knowingly sought to induce Ricochet or Appellees to breach the PGAs.

Appellees, on the other hand, argue Texas law recognizes that interference occurs when a defendant's conduct lessens the value of the promisor's performance. *See Hughes*, 680 S.W.2d at 842 (concluding that the counter-defendants' interference delayed the closing of the sale, which lessened the value of performance to the counter-plaintiffs). They argue Lamont intentionally deceived Ricochet to allow him access to the Lopeno Prospect Treasure Map. Consequently, they claim, the value of their trade secret was lessened.

## B. Analysis

The evidence established that Lamont was familiar with the PGAs' purpose of providing Appellees with prospects for investment, the proprietary nature of the seismic data generated by Ricochet under the PGAs, and the payments made to Ricochet. Lamont testified that as a director and an officer of Ricochet, he had a duty to protect Appellees' proprietary interests under the "proprietary" clauses of the PGAs. On the other hand, he also testified that because he did not sign the PGAs, he had no duties under those agreements. Evidence was also introduced establishing that Lamont, as an officer of Ricochet, ratified in writing all actions taken by other officers, including the execution of the PGAs by Hamblin.

Lamont knew that the Lopeno Prospect was valuable. There is no dispute that he gained possession of the Treasure Map while negotiating his separation agreement with Ricochet. However, Lamont never had permission to share the Treasure Map with Carranco to dilute Ricochet's or Appellees' interest in the Lopeno Prospect. A jury could have reasonably concluded that (1) by Carranco and Montecristo II leasing the El Milagro property, and (2) by Lamont's and L.O.G.'s placement of the El Milagro wells, they interfered with Appellees' PGAs. This interference lessened the value of the seismic map to Vaquillas and JOB, lessened the value of the Treasure Map itself, and lessened their interest in the Lopeno Prospect.

As to Carranco, the evidence established that without Appellees' knowledge, he met with Lamont even before Lamont requested the seismic maps. He testified that Lamont had a duty to protect Ricochet's property, even though he denied knowing that Ricochet had a contract with Appellees. Yet, Dino Smith, a manager at Vaquillas, testified that Carranco personally told Smith that he knew of the existence of the PGAs and the map. Given the secrecy of the meetings between Lamont and Carranco, a reasonable jury could have inferred that Lamont and Carranco induced Hamblin to allow them access to the Treasure Map. This is further evidenced by Carranco's testimony that before February 5, 2007, Lamont offered him 10% of his working-interest in four prospects, including the Lopeno Prospect, and that Lamont promised to get with Hamblin to obtain the map. The Treasure Map was e-mailed to Lamont on February 5, 2007, and Montecristo II began negotiations with El Milagro lessors less than a month later.

The fact that L.O.G.'s El Milagro wells were producing gas from the Lopeno Prospect gas reservoir reduced the value of the PGAs and the Worley wells. *See Khan*, 371 S.W.3d at 360. The reduced ability to produce gas from the Lopeno Prospect gas reservoir diminished the value of the Treasure Map and Appellees' investment. There was ample evidence on which a reasonable jury could find that Appellees suffered damage due to Appellants' interference.

## C. Conclusion

There is no question that contracts existed between Ricochet and Appellees and that Appellants knew of the contracts. The record substantiates the jury's findings that Carranco and Montecristo II intentionally interfered with the contracts by leasing the El Milagro property. Without the Treasure Map, the El Milagro lease would be based on pure speculation. The secrecy surrounding their negotiations over the El Milagro lease, including the establishment of Montecristo II two days before signing the lease, is further evidence that their interference was intentional and willful. Moreover, L.O.G.'s placement of the El Milagro wells on the 108 acres

identified on the Treasure Map, in less than six months, is evidence of Appellants' intent to drain the gas reservoir as quickly as possible, which was necessarily to Appellees' detriment.

We conclude the evidence is legally and factually sufficient to support the jury's findings that Appellants intentionally interfered with Ricochet's contracts with Appellees and in doing so, Appellants lessened the value of Appellees' investments. Accordingly, Appellants' issues related to the jury's intentional interference findings are overruled. We thus turn to Appellants' complaints regarding their alleged justification defense.

### LEGAL JUSTIFICATION OR PRIVILEGE DEFENSE

The jury was asked whether Appellants had a good-faith belief that they had a right to interfere. The jury answered no. Legal justification or privilege "is an affirmative defense to tortious interference with contract." *Prudential Ins.*, 29 S.W.3d at 80 (citing *Calvillo v. Gonzalez*, 922 S.W.2d 928, 929 (Tex. 1996)); *accord Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689–90 (Tex. 1989). Texas law recognizes a privilege to interfere with a contract if the defendant is exercising "either (1) [its] own legal rights or (2) a good-faith claim to a colorable legal right." *See Prudential Ins. Co.*, 29 S.W.3d at 80. A good-faith belief of a right is a belief that is objectively well grounded and justifiable. *Bennett v. Computer Assocs. Int'l, Inc.*, 932 S.W.2d 197, 203 (Tex. App.—Amarillo 1996, writ denied). "Enforcing or complying with one's own valid contract does not constitute unjustifiable interference with another's contract." *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 77 (Tex. App—Houston [1st Dist.] 2011, no pet.).

The defense of justification is not applicable when there is interference by illegal or tortious means, such as misrepresentation or fraud. *See Prudential Ins. Co.*, 29 S.W.3d at 81. "The party asserting [legal justification] does not deny the interference but rather seeks to avoid liability based upon a claimed interest that is being impaired or destroyed by the plaintiff's contract." *Sterner*, 767 S.W.2d at 689–90. Under this defense, "one is privileged to interfere with another's contract

(1) if it is done in a bona fide exercise of his own rights, or (2) if he has an equal or superior right in the subject matter to that of the other party." *Id.* at 691. A legal sufficiency challenge to an adverse jury finding on which the party challenging the finding had the burden of proof requires that party to show that the evidence conclusively established all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). A factual sufficiency challenge requires the challenger to prove the finding is "so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.*

## A. Arguments of the Parties

Appellants argue that because they were entitled to exercise their own valid contractual rights, they were justified in interfering with the PGAs. They contend Lamont legitimately received the seismic map because of the contracts he was negotiating with Ricochet—the division of the prospects and the separation agreement. Lamont asserts that under each contract he had the right to possess the seismic map without authorization from either of Appellees. With respect to Carranco, Montecristo II, and L.O.G., Appellants argue El Milagro property owners had no obligation to lease to Ricochet or to Appellees, and could have leased to anyone. Because Montecristo II assigned part of its interest in the lease to L.O.G., all three were entitled to exercise their valid contractual rights to compete against Appellees for the gas in the reservoir.

Appellees argue the seismic map was obtained by deceit and thus precludes Appellants' defense of justification. Appellees also point out that Appellants, specifically Lamont, did not purchase the map from Ricochet. Thus, Lamont's, and thereby Appellants', use of the map was limited to his working-interest in the Lopeno Prospect. Appellees never authorized Lamont to take or use the map for his own benefit to Appellees' detriment.

**B. Analysis**

We first turn to the question of whether Lamont had a good-faith belief that he had the right to interfere with Ricochet's contracts with Appellees or that he had an equal or superior right "in the subject matter to that of the other party." *See Sterner*, 767 S.W.2d at 691. As we previously addressed, the record reflects that Appellants obtained the Treasure Map by improper means. By his own testimony, Lamont's separation agreement with Ricochet did not provide Lamont the right "to take" any seismic data for any of Ricochet's prospects, specifically the Treasure Map. Further, Chris Sisk, the chief financial officer of Vaquillas testified that neither Vaquillas nor JOB gave Lamont authority to take or use the Treasure Map. As to the remaining Appellants, although they were exercising their rights under the lease agreement with the El Milagro lessors, they entered into the lease agreement only after obtaining the Treasure Map through improper means.

Under Lamont's working-interest ownership rights in the Worley wells, Lamont was entitled to 29% of the revenues (less costs). Assuming the gas reservoir produced $40–60 million in revenues, Lamont would have been entitled to approximately $12–17 million (less costs). By partnering with Carranco, Lamont was entitled to 50% of the revenues from the L.O.G. El Milagro wells. If Appellants could extract even one-half of the gas from the Lopeno Prospect gas reservoir, Lamont's revenues would increase by more than 50%. Carranco's earnings, which were otherwise limited to 10% of Lamont's working-interest in the Worley wells, would increase many times over.

**C. Conclusion**

The record does not support Appellants' assertions that they conclusively established all the vital facts in support of their affirmative defense or that the jury's finding was so against the great weight and preponderance of the evidence that it was clearly wrong and unjust. *See Francis*, 46 S.W.3d at 241. As such, we conclude the evidence is legally and factually sufficient to support the jury's finding that Appellants did not have a good-faith belief that they had a right to interfere

in the existing contracts between Ricochet and Appellees. *See id.* Accordingly, we overrule Appellants' issues relating to their legal justification and privilege defenses.

CONSPIRACY

The jury was asked whether Appellants conspired to damage Appellees. The jury answered "yes" as to each Appellant. The elements of a civil conspiracy claim are "(1) two or more persons; (2) an objective to be accomplished; (3) a meeting of the minds on the objective [or course of action]; (4) one or more unlawful, overt acts in furtherance of the objective; and, (5) damages as a proximate result." *San Antonio Credit Union v. O'Connor*, 115 S.W.3d 82, 90–91 (Tex. App.— San Antonio 2003, pet. denied) (citing *Operation Rescue–Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 975 S.W.2d 546, 553 (Tex. 1998)). Conspiracy may be proved by direct or circumstantial evidence. *See Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581–82 (Tex. 1963). Where circumstantial evidence is presented, conspiracy cannot be proven by "piling inference upon inference." *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.¸* 435 S.W.2d 854, 858 (Tex. 1968).

The record is replete with evidence of a "meeting of the minds" between Carranco and Lamont. At a minimum, both individuals testified to their numerous meetings and their goal to lease the El Milagro property in order to drain the gas reservoir prior to Ricochet withdrawing the gas via the Worley wells. The second and third elements require that each of the co-conspirators "have a specific intent to commit the act." *O'Connor*, 115 S.W.3d at 90–91 (citing *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996)). "For specific intent to exist, the parties must be aware of the harm or the wrongful conduct at the beginning of the agreement and intend to cause that harm." *Id.* (citing *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 617 (Tex. 1996); *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995)).

## A. Arguments of Parties

Appellants argue that, as a matter of law, L.O.G. could not have conspired with Lamont, and Montecristo II with Carranco because Lamont was in essence L.O.G. and Carranco was Montecristo II. They further contend that Montecristo II could not have conspired with any of the other appellants because it was not formed until after the alleged conspiracy. L.O.G. was formed in December 2006.

Appellees argue the direct evidence shows that Carranco and Lamont, by agreeing to a 50/50 share in Montecristo II's Milagro lease and L.O.G.'s well production, had an objective to improperly use a trade secret, i.e., the Lopeno Prospect Treasure Map. Additionally, it was foreseeable that if Appellants used improper means to acquire and use the trade secret, or that if they interfered with the PGAs, such conduct would injure Appellees. They further argue that Lamont and Carranco, as individuals, could conspire with one another and therefore be jointly and severally liable for their collective wrongdoing. Similarly, Lamont could conspire with Montecristo II, and Carranco could conspire with L.O.G. We agree.

## B. Analysis

Both Lamont and Carranco were experienced in the oil and gas industry. Carranco owned several leases in South Texas and Lamont was an established oil and gas engineer and surveyor. They both testified to several non-disclosed meetings, shortly before and after Lamont left Ricochet, all of which were intentionally kept secret. Although Lamont owned a 29% working-interest in the Worley wells, and offered to sell part of that interest to Carranco, both men understood their potential earnings were limited to that 29% working-interest. Increasing their potential profits required a separate and distinct means of capturing the gas contained within the Lopeno Prospect.

During the February 22, 2007 meeting, Carranco testified that it was his idea "they partner up." In exchange for approximately $65,000.00, Carranco purchased 10% of Lamont's working-interest in the Lopeno Prospect. Carranco and Lamont also entered into an agreement wherein they would equally divide the shares in Montecristo II's El Milagro lease and L.O.G.'s well production.

The record shows Montecristo II negotiated a lease of the El Milagro property that required an up-front bonus payment exceeding $1 million. In order to issue the loan, the bank relied on Lamont's assurances of the Lopeno Prospect gas reservoir's value. Those numbers came directly from Appellees' trade secret information.

Although Montecristo II was not established at the time of Lamont's and Carranco's February 2007 meetings, Lamont's and Carranco's plans to "partner-up" necessitated both a company to lease the El Milagro property and a company to drill the wells to produce the gas. The circumstantial evidence establishes that Carranco and Lamont's secret meetings, the establishment of Montecristo II, and the creation of L.O.G. were all acts in furtherance of the conspiracy. L.O.G. was established to drill wells over the Lopeno Prospect gas reservoir and Montecristo II was established to lease the El Milagro property and to be a working-interest owner with L.O.G.

With regard to L.O.G.'s wells, all four wells were placed directly over the gas reservoir as identified by the Treasure Map. Although Lamont and Carranco claim the Treasure Map was not the basis of either the El Milagro lease or the placement of the wells, the map was the only means by which Carranco, Lamont, Montecristo II, or L.O.G. could know where the gas reservoir was located. Without the seismic information developed by Ricochet and paid for by Appellees, L.O.G.'s placement of the wells would have been no more than a guess. There is also direct evidence that both Lamont and Carranco knew that depleting the reservoir would damage Appellees. A reasonable jury could conclude that in light of all the other evidence, Lamont,

Carranco, Montecristo II, and L.O.G. all participated in a conspiracy to deplete the Lopeno Prospect and by doing so, damaged Appellees.

The evidence shows that, initially, Lamont was acting individually for his own interests when he conspired with Carranco to obtain the Treasure Map for their mutual benefit. Lamont further conspired with Carranco to use Montecristo II to shield Lamont's identity from the public records involving the El Milagro lease agreement. L.O.G. conspired with Montecristo II to obtain an assignment of the El Milagro leasehold for L.O.G.'s and Montecristo II's mutual benefit. Finally, L.O.G., acting through Lamont as its owner, gave the bank evidence of the value of the El Milagro leasehold. By doing so, L.O.G. ratified Lamont's improper use of the Treasure Map. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 536 (Tex. 2002).

Carranco conspired with Lamont independently from Montecristo II for their mutual benefit. Carranco received the Treasure Map before Montecristo II existed. Montecristo II, acting through Carranco, executed the leases for El Milagro and then assigned fifty percent of the El Milagro lease to L.O.G for the benefit of L.O.G. and Montecristo II.

Based on all the evidence, we conclude that the evidence was legally and factually sufficient for the jury's finding that each Appellant participated in the conspiracy for their own benefit.[4]

## C. Conclusion

In response to whether Lamont, Carranco, L.O.G., or Montecristo II engaged in a conspiracy, the jury responded yes as to each. As previously addressed, the Treasure Map was acquired by improper means and Appellants used the map to interfere with Ricochet's existing

---

[4] We do not address whether Carranco could have conspired with Montecristo II, because he could have conspired with Lamont and L.O.G. Conversely, we do not address whether Lamont could have conspired with L.O.G., because he could have conspired with both Carranco and Montecristo II.

contracts with Appellees. Based on the record before us, we conclude the evidence is both legally and factually sufficient to support the jury's findings regarding a "meeting of the minds" between the appellants with the specific intent to misappropriate the Treasure Map and to tortiously interfere in the PGAs. Accordingly, Appellants' issues relating to the conspiracy are overruled.

PROXIMATE CAUSE DEFINITION

Appellants argue the trial court's definition of proximate cause is legally incorrect and that failure to give the proper instruction was harmful error.

## A. Jury Instructions

Texas Rule of Civil Procedure 277 requires the court to "submit such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 221 (Tex. 2010) (citing *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002)). When a party challenges a trial court's definition in the jury charge as legally incorrect, we conduct a de novo review. *Id.* (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex. 2002)).

Appellees argue the trial court was required to set forth the two elements of proximate cause: "cause in fact (or substantial factor) and foreseeability." *See Crump*, 330 S.W.3d at 222. "Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Id.* at 222–23 (citing *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 798–99 (Tex. 2004)).

## B. Court's Charge

Tracking the Texas Pattern Jury Charge on "proximate cause" and "new and independent cause," the trial court instructed the jury as follows:

> Proximate cause, means that cause which, in a natural and continuous sequence, unbroken by any new and independent cause, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a physician exercising ordinary care would have foreseen that the event[] might reasonably result therefrom. There may be more than one proximate cause of an event.
>
> New and independent cause means the act or omission of a separate and independent agency, not reasonably foreseeable by a physician exercising ordinary care, [] destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question and thereby becomes the immediate cause of such occurrence.

*See* 2 COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES PJC 50.4 (2006).

Appellants filed a proposed jury instruction and argued for the instruction at both charge conferences. Their proposed instruction read as follows:

> "Proximate Cause" means that cause which, in a natural and continuous sequence, unbroken by any new and independent cause, produces an event, and without which cause such event would not have occurred. "Proximate cause" has two parts:
>
> 1. A proximate cause is a substantial factor that brings about an event and without which the event would not have occurred; and
> 2. A proximate cause is foreseeable. "Foreseeable" means that a person using ordinary care would have reasonably anticipated that his acts or failure to act would have caused the event or some similar event.

Appellants argue that the trial court's instruction was incorrect because it failed to require the jury to find their conduct was a substantial factor in bringing about Appellees' damages.

## C. Analysis

During the charge conference, Appellants argued the definition of proximate cause should be based on the language in *Transcontinental Insurance Co. v. Crump*. *See Crump*, 330 S.W.3d at 221. In *Crump*, the court examined the causation standards for proximate cause and producing cause. *Id.* at 221–25 (relying on *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007)). Relying on *IHS Cedars Treatment Ctr v. Mason*, 143 S.W.3d at 798–99, the court held: "Cause in

fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Crump*, 330 S.W.3d at 222–23. Appellants asserted that the rationale set forth in *Crump* should control—that "the producing cause inquiry is conceptually identical to that of cause in fact." *See id.* at 223.

We note that both *Crump* and *Ledesma* are products liability cases and, thus, the question of producing versus proximate cause is an important distinction. In this case the only question is one of proximate cause. We further acknowledge the definition given by the trial court is not only based on the Texas Pattern Jury Charge, but the long accepted definition set forth by the Texas Supreme Court in *Rudes v. Gottschalk*, 324 S.W.2d 201, 207 (Tex. 1959), and has been cited in numerous cases. Although the 2010 version of the Texas Pattern Jury Charge, enacted after the trial here, now includes the term "substantial factor" in the definition of proximate cause, it is by no means dispositive of the issue. *See H.E. Butt Grocery Co. v. Bilotto*, 928 S.W.2d 197, 199 (Tex. App.—San Antonio 1996), *aff'd*, 985 S.W.2d 22 (Tex. 1998) (noting that Texas Pattern Jury Charges are not "law," but instead recommendations "based on what the committee 'perceives the present law to be'" (quoting 1 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES, Introduction at xx (1987))).

## D. Conclusion

Although the Texas Supreme Court may someday overrule the traditional definition of proximate cause, we are not free to do so in light of *Rudes*. The trial court followed the appropriate Pattern Jury Charge, a source widely accepted in the legal community and a definition that is still good law. *See id.* Therefore, we cannot conclude the submission amounted to a "clear failure . . . to analyze or apply the law." *See id.* (quoting *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992)).

**LOST PROFITS DAMAGES**

A plaintiff may recover lost profits in a cause of action for misappropriation of trade secrets and in one for tortious interference with business contracts. *See Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 90 (Tex. 1973) (reviewing recovery of plaintiff's lost profits in a misappropriation of trade secrets case); *Fluor Enters. v. Conex Int'l Corp.*, 273 S.W.3d 426, 447 (Tex. App.—Beaumont 2008, pet. denied) (reviewing recovery of plaintiff's lost profits in a tortious interference with existing contract case). The measure of damages is "based on net profits, not gross revenue or gross profits." *Univ. Gen. Hosp., LP v. Prexus Health Consultants, LLC*, 403 S.W.3d 547, 551 (Tex. App.—Houston [14th Dist.] 2013, no pet. h.) (citing *Kellmann v. Workstation Integrations, Inc.*, 332 S.W.3d 679, 684 (Tex. App.—Houston [14th Dist.] 2010, no pet.)).

"Damages in trade secret cases can take a variety of forms. The variety of approaches demonstrates the 'flexible and imaginative' methods employed." *Sw. Energy Prod. Co. v. Berry–Helfand*, No. 12-11-00370-CV, 2013 WL 3461644, at *24 (Tex. App.—Tyler, July 10, 2013, no pet. h.) (quoting *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974)). "The methods used to calculate damages include the value of the plaintiffs['] lost profits, the defendant's actual profits from the use of the secret, the value that a reasonably prudent investor would have paid for the trade secret, the development costs the defendant avoided by the misappropriation, and a 'reasonable royalty.'" *Id.* (citations omitted).

Lost profits must be proven with reasonable certainty and by competent evidence. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010). Proof may be established, but is not so required, by expert testimony. *See id.*; *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). Whether the evidence supports a reasonable certainty of lost profits is a question of fact. *ERI Consulting Eng'rs*, 318 S.W.3d at 876.

> Recovery for lost profits does not require that the loss be susceptible of exact calculation. However, the injured party must do more than show that they suffered some lost profits. The amount of the loss must be shown by competent evidence with reasonable certainty. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. Although supporting documentation may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.

*Id.* (quoting *Holt Atherton Indus.*, 835 S.W.2d at 84). A plaintiff "must do more than show [it] suffered some lost profits." *Hous. Mercantile Exch. Corp. v. Dailey Petrol. Corp.*, 930 S.W.2d 242, 248 (Tex. App.—Houston [14th Dist.] 1996, no writ) (citing *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994) (per curiam)). The evidence must show that the lost profit damages are not uncertain or speculative. *Tex. Instruments, Inc. v. Teletron Energy Mgmt.*, 877 S.W.2d 276, 279 (Tex. 1994).

> Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered. Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect.

*Id.*; *see SBC Operations, Inc. v. Business Equation, Inc.*, 75 S.W.3d 462, 467 (Tex. App.—San Antonio 2001, pet. denied). We next turn to whether the evidence was too speculative or uncertain.

## A. Arguments of Parties

Appellants argue that the jury's award of lost profits to Appellees is too speculative because it is unsupported by the evidence and based on an unsupported assumption that only Appellants could have drilled on the El Milagro property. Appellants point out that Appellees' expert, George Hite, based his damage calculation model on the unfounded and factually unsupported assumption that if L.O.G. had not drilled on the El Milagro lease, no other operator would have drilled on that

property. For this reason, Appellants claim the evidence of lost profits is "uncertain" and speculative, and legally and factually insufficient to support the jury's verdict.

Appellees argue the record supports the $4.9 million award of lost profits. They assert that Appellants simply focus on a single assumption and ignore the totality of the evidence supporting the jury's verdict. Their position is that whether a third party would have drilled on the El Milagro property, had L.O.G. not drilled on that property, is immaterial for three reasons: (1) drilling on the El Milagro property was not an activity dependent on changing markets or speculative profits; (2) the calculation of net profits was based on certainty because it was based on actual production of gas, on geological data, and on actual profit from the El Milagro wells; and (3) Appellants drained the gas reservoir.

## B. Analysis

At trial, Appellees' expert George Hite testified he calculated the net lost profits sustained by Appellees by considering the revenues generated by Appellants' wells, the well production and activity data, the reserve data, the well and reservoir pressure tests and curves, the monthly production from the entire reservoir, and the operating costs for each well, and natural gas prices. He further explained that his data was based on what each well actually produced, not on uncertainty or speculation.

Hite acknowledged that his model assumed another operator would not have drilled on the Lopeno Prospect gas reservoir if Appellants had not done so. As such, Appellees' wells on the Worley lease would have drained the gas reservoir without interruption. However, this assumption is irrelevant because Hite presented objective data regarding his calculation of the amount of gas drilled by Appellants, the market value of gas, the amount of gas in the reservoir, and uncontroverted evidence that Appellants depleted the reservoir. Moreover, the record supports that development of Ricochet's seismic data took several years to establish. Maier identified the

area in 2003 and the first well was not drilled until 2007. During that time, Maier examined a plethora of information and continuously updated the Lopeno Prospect Treasure Map.

The record does not support Appellants' assumption that if they had not drilled on the El Milagro property, someone else would have done so. Although other companies were interested in an El Milagro lease, not a single witness could recall what companies or the terms under which they were interested in a lease. The only evidence in the record of any other attempt to lease the El Milagro property was by Ricochet. Additionally, there is no evidence that any exploration company, other than Ricochet, had identified the Lopeno Prospect as a field that could produce in paying quantities.

Ricochet's first two wells, drilled prior to the El Milagro wells, produced approximately 25% of the entire reservoir in less than four months. Appellants drilled their first well in August of 2007, and within six months had drilled more wells and drained the reservoir. Without the Treasure Map, and its identification of the exact placement of the Lopeno Prospect gas reservoir, the depth of the reservoir, or the size of the reservoir, Appellants would have been drilling blindly because they did not make contact with anyone to begin gathering seismic data prior to June 14, 2007. Thus, but for the Treasure Map, Appellants could not have known where to place their wells. The record shows that the jury could have reasonably believed the Worley wells would have drained the reservoir before any other drilling of the Lopeno Prospect gas reservoir could interfere.

## C. Conclusion

We remain mindful that lost profits is a fact question for the jury. *See ERI Consulting Eng'rs*, 318 S.W.3d at 876. Appellants presented their argument to the jury, but the jury clearly chose to disbelieve part or all of the testimony and to rely on Appellees' expert testimony. The evidence was neither too speculative nor uncertain. *See Tex. Instruments*, 877 S.W.2d at 280.

Therefore, we conclude the testimony provided a reasonably certain basis by which the jury could establish the damages. We overrule Appellants' issue related to lost profits.

## CONCLUSION

Based on a review of the entire record, we conclude the evidence is legally and factually sufficient to support the jury's findings that Appellants misappropriated Appellees' trade secret. The Lopeno Prospect Treasure Map maintained its trade secret status even though it was shared with prospective working-interest owners and investors. Lamont, as a former Ricochet employee, had a duty to protect the secret nature of the map. We likewise conclude that Appellants used improper means to secure the information contained in the map. Although Appellants could properly view the map as working-interest owners in the Lopeno Prospect, they did not have the right to use the map in a manner adverse to Ricochet. Their actions to the contrary fell below the accepted standards of commercial morality and reasonable conduct.

The evidence is also legally and factually sufficient to support the jury's findings that Appellants tortiously interfered with the agreements between Ricochet and Appellees by wrongfully using the Lopeno Prospect Treasure Map in an attempt to diminish performance under the PGAs. Appellants established companies for the sole purpose of leasing and drilling the El Milagro property to deplete the reservoir. In doing so, Appellants tortiously interfered with Ricochet's performance of the Worley wells, reducing the value of the Worley wells and Appellees' proprietary interest in the Treasure Map. Moreover, the evidence does not show that Appellants were justified, in good faith, to interfere in the existing contracts between Ricochet and Appellees.

We further conclude the evidence is legally and factually sufficient to support the jury's finding that Appellants engaged in a conspiracy that damaged Appellees. Appellants held several undisclosed meetings and used Montecristo II to hide Lamont's identity while negotiating the El

Milagro lease. As we previously decided, Appellants procured the Treasure Map by improper means and then used the map to interfere in Appellees' existing contracts. Moreover, Appellants formed L.O.G. to drill wells over the Lopeno Prospect gas reservoir and Montecristo II was established to lease the El Milagro property and to be a working-interest owner with L.O.G.

With regard to the instructions contained within the jury charge, we conclude that the trial court's definition of "proximate cause" was neither harmful nor reversible error. Finally, the question of lost profits is a fact question for the jury. We conclude the evidence before the jury was neither speculative nor uncertain; it was legally and factually sufficient to support the jury's award of lost profits.

Patricia O. Alvarez, Justice