**H.E. BUTT GROCERY COMPANY,**
Appellant,

v.

**MOODY'S QUALITY MEATS, INC. and**
**Henry C. Moody, Appellees.**

No. 13–95–038–CV.

Court of Appeals of Texas,
Corpus Christi.

May 22, 1997.

Rehearing Overruled Aug. 28, 1997.

**34**

John L. Carter, Karen Jewell, Vinson & Elkins, Houston, J.A. Canales, Canales & Simonson, P.C., Jo Ellen Hewins, Corpus Christi, for appellant.

David L. Smith, Bryan Powers, Paul Dodson, Van Huseman, White, Huseman, Pletcher & Powers, Corpus Christi, Albert Kimball, Jr., Pravel, Gambrell, Hewitt, Kimball & Kriger, Houston, for appellees.

Before DORSEY, FEDERICO G. HINOJOSA, Jr. and RODRIGUEZ, JJ.

## OPINION

FEDERICO G. HINOJOSA, Jr., Justice.

Appellees, Moody's Quality Meats, Inc. and Henry Moody ("Moody"), sued H.E. Butt Grocery Co. ("HEB") for misappropriation of a trade secret—Moody's process for making premarinated beef fajitas. After a jury found for appellees, the trial court entered a judgment against HEB for $3,139,263.87. HEB complains, by four points of error, that the evidence is legally and factually insufficient to support the jury's findings, that the trial court gave the jury improper instructions, and that the trial court improperly allowed a patent into evidence. We reverse and remand.

In January 1988, Moody began selling premarinated fajitas. The recipe and process for marinating beef fajitas was developed by Henry Moody in late 1987.[1] In 1989, Moody was interested in selling the process and asked to meet with someone from HEB. In May 1989, Charles Hendryx, HEB's vice president of meat marketing, met with Henry Moody to discuss the marinating process. Appellees alleged that the five-element process[2] is a trade secret and that during the meeting, Henry Moody disclosed this secret to Hendryx in confidence. HEB began processing and selling its own premarinated fajitas in September 1989. Believing that Moody's trade secret process was being used to produce HEB's premarinated fajitas, appellees sued HEB for misappropriation of a trade secret. HEB generally denied the allegations. A jury found that HEB misappropriated Moody's trade secret after it was communicated to HEB in confidence. The trial court denied HEB's motions for directed verdict and judgment *non obstante veredicto.* The trial court also denied HEB's motion for new trial.

In order to bring a successful claim for misappropriation of a trade secret, a plaintiff must prove: 1) that there was a trade secret, 2) that the secret was disclosed to another person in confidence, and 3) that the other person used the secret without authorization. *Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 777, *cert. denied,* 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 148 (1958). A person is liable for misappropriation of a trade secret when (a) he discovers the secret through improper means or (b) his use constitutes a breach of confidence reposed in him by the one disclosing the secret. *Id.* at 769.

### Legal Sufficiency of the Evidence

By the first part of its first point of error, HEB complains that the evidence is legally insufficient to support the jury's finding on liability. HEB contends that appellees failed to show that the marinating process was a trade secret, that it was communicated to Charles Hendryx in confidence, and that HEB used it without authorization.

When we review a "no evidence" or legal sufficiency of the evidence point, we consider

---

1. Moody's recipe is as follows:
 200 lbs. of beef skirt, untrimmed
 78 lbs. of tap water
 6 lbs. of isolated soya protein
 1 lb. of sodium phosphate (sodium tri-poly)
 5 lbs. of Moody's special seasoning (or like)
 The isolated soya protein and sodium phosphate are dissolved in water, then all ingredients are put into a vacuum tumbler for approximately 45 minutes.

2. At trial, appellees claimed that the five-element process is beef, water, protein, sodium phosphate in a tumbler.

only the evidence and reasonable inferences that tend to support the jury's finding, and we disregard all evidence and inferences to the contrary. *Responsive Terminal Sys. Inc. v. Boy Scouts of Am.*, 774 S.W.2d 666, 668 (Tex.1989). We sustain a "no evidence" point of error when the record discloses: 1) a complete absence of evidence of a vital fact, 2) that the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, 3) that the evidence offered to prove a vital fact is no more than a mere scintilla, and 4) that the evidence established conclusively the opposite of the vital fact. *Juliette Fowler Homes, Inc. v. Welch Assoc.*, 793 S.W.2d 660, 666 n. 9 (Tex.1990). We overrule the point and uphold the finding if there is more than a scintilla of evidence to support the finding. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex. 1987). The test for this no evidence/scintilla rule is that if reasonable minds cannot differ from the conclusion that the evidence offered to support the existence of a vital fact lacks probative force, it will be held to be the legal equivalent of no evidence. *Id.*

## A. Was there a trade secret?

 A trade secret is any formula, pattern, device, or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it. *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex.1996); *Hyde Corp.*, 314 S.W.2d at 776. To be accorded the court's protection, proprietary information must be more than merely of a kind and character encompassed by the definition. *Numed, Inc. v. McNutt*, 724 S.W.2d 432, 435 (Tex.App.—Fort Worth 1987, no writ); *Richardson & Assocs., Inc. v. Andrews*, 718 S.W.2d 833, 837 (Tex.App.—Houston [14th Dist.] 1986, no writ). The key part of the definition of trade secret is secrecy. *Luccous v. J.C. Kinley Co.*, 376 S.W.2d 336, 338 (Tex.1964); *Wissman v. Boucher*, 150 Tex. 326, 240 S.W.2d 278, 280 (1951); *Stewart & Stevenson Servs., Inc. v. Serv–Tech, Inc.*, 879 S.W.2d 89, 98 (Tex.App.—Houston [14th Dist.] 1994, writ denied); *Gonzales v. Zamora*, 791 S.W.2d 258, 264 (Tex.App.—Corpus Christi 1990, no writ).

 The word "secret" implies that the information is not generally known or readily available by independent investigation. *Zamora*, 791 S.W.2d at 264; *Richardson & Assoc., Inc.*, 718 S.W.2d at 837. The procedure or device may be based on a previously existing idea in the industry and still be entitled to protection, so long as the procedure or device is not generally known. *K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.*, 158 Tex. 594, 314 S.W.2d 782, 785 (1958).

 After reviewing the record, we find the following evidence in support of the jury's finding that a trade secret existed. Henry Moody was in the meat business for thirty years and he always tried to stay ahead of his competitors. Several months after Norman Cunningham, an Archer–Daniels–Midland ("ADM") sales representative, suggested the use of isolated soya protein, Moody created a five-element process for beef fajitas. Moody's process combined beef skirt, water, isolated soya protein, and sodium triphosphate in a vacuum tumbler. Moody testified that this process gave him a competitive edge because he could offer a juicier, more tender, more flavorful fajita than his competitors. According to Moody, his sales probably tripled after he began using this process. Moody testified that at the time he met with Charles Hendryx, the process was not generally known.

Moody's wife, Earline Moody, testified that to her knowledge the marinating process was not available to the general public. Terry Moench, Moody's stepson and a manager of one of Moody's meat markets at the time of the meeting, also testified that he considered the process to be secret. James Camillo Flanagan, a mechanical engineer who testified as an expert for appellees, testified that when Moody started using the technique it was new and unique.

Giuseppe Favarato testified that when he purchased Moody's meat business, he was not given the secret process. Instead, Moody provided him with a recipe that did not use isolated soya protein.

This testimony supports the claim that the process was not generally known in the meat industry. Viewing this testimony in the light most favorable to the jury's verdict, we find it to be some evidence that Moody's process was a trade secret.

## B. Was the secret disclosed to HEB in confidence?

### 1. Did Moody disclose the secret to HEB?

■ Moody testified at trial that he revealed his five-element process to Hendryx during their meeting. Moody testified as follows:

Q: Okay. And did you describe to them how you made these fajitas very good?

A: Yes, sir, I did.

Q: Okay.

A: I told them that—during—now, this is in the course of an hour and a half while they were there.

Q: All right.

A: I don't know exactly what time during that hour and a half this was said but we told them that we were tumbling, we told them that we were using protein and water and phosphate.

Viewing this testimony in the light most favorable to the jury's verdict, we find it to be some evidence that Moody revealed his fajita marinating process to Hendryx during their meeting.

### 2. Was the secret disclosed In confidence?

■ Trade secret information disclosed pursuant to negotiations for the sale of a business are disclosed under a duty of confidence imposed as a matter of law. *Hyde Corp.,* 314 S.W.2d at 769–70; *Phillips v. Frey,* 20 F.3d 623, 631 (5th Cir.1994) (applying Texas law). The *Hyde* court noted that this principle is illustrated in the Restatement of Torts:

For example, A has a trade secret which he wishes to sell with or without his business. B is a prospective purchaser. In the course of negotiations, A discloses the secret to B solely for the purpose of enabling him to appraise its value. Or, A requests a loan from B, a banker, for the purpose of aiding the manufacture of a product by A's secret process. In order to assure B about the soundness of the loan, A discloses the secret to him in confidence. In both cases B is under a duty not to disclose the secret or use it adversely to A.

314 S.W.2d at 770 (quoting 4 RESTATEMENT OF TORTS § 757, Comment on Clause (b) p. 13). Moody admitted at trial that he never told Hendryx to keep the five-element process a secret, or that he told Hendryx about the process in confidence. Nevertheless, Moody argues that he disclosed his process to Hendryx because he wanted to sell his business to HEB.

HEB denies that Moody ever told it about his process, but argues that even if he did, there is no evidence that he did so in confidence. HEB points to Moody's testimony at trial that he did not specifically notify Hendryx that the information concerning his premarinating process was to be kept secret. HEB argues that if Moody indeed told Hendryx, a competitor, about his process, he lost his secret since Hendryx had no duty to not further disclose or use the secret. *Furr's Inc. v. United Specialty Advertising Co.,* 385 S.W.2d 456, 459 (Tex.Civ.App.—El Paso 1964, writ ref'd n.r.e.).

If there is any probative evidence in the record that Hendryx knew or should have known that Moody's process was a secret and disclosed to him in confidence, there will be legally sufficient evidence to support the jury's implied finding that Moody disclosed his process to Hendryx in confidence.

At trial, Hendryx testified that he knew Moody wanted to sell his business to HEB. Hendryx visited Moody's store because Moody had called HEB regarding such a sale. Hendryx never thought that Moody wanted to do HEB a favor. Moody told Hendryx, during the meeting, that he wanted to sell his business and retire. Moody also told him that these fajitas could make a lot of money for HEB. Hendryx knew that Moody had a process for making fajitas, and that Moody was proud of his fajitas. Moody told Hendryx that he had been very successful with these fajitas, and that "if [Moody] was able to supply [HEB] with the fajitas using that process that [HEB] would be able to

make money...." Hendryx testified that HEB considers its fajita recipe to be exclusively its own and will not give it out to others.

Hendryx purchased some of Moody's fajitas (as well as some of Moody's other products) and took them back to San Antonio for testing. Hendryx told Moody that "we would test the product and if there were any interest on the part of the deli people or us in the meat that we would get back to him." Hendryx knew before the visit that HEB would not be interested in buying Moody's business, but he made the visit anyway out of courtesy to Moody.

Moody testified that after he developed his five-element process for marinating fajitas, he attempted to interest HEB in using the process and his "ideas about how to apply these principles to fajitas[.]" During his telephone conversation with Hendryx, Moody "told him that we had perfected a fajita that we thought was very, very good and he said that he would like to look at it...." Moody told Hendryx during the visit how he marinated the fajitas, and that the process provided him with a competitive edge. Moody admitted that there were no discussions of fees or royalties during the meeting.

Terry Moench testified that he was present during the meeting between Moody and Hendryx and that the meeting was held because Moody was trying to introduce the fajita process to HEB. According to Moench, Hendryx ate some of Moody's fajitas. Moody told Hendryx that he wanted HEB to have the premarinating process in order to enhance their growth; that with HEB's distribution, stores, and facilities "they would be able to move an incredible amount and we could help them make an [sic] excess of ten million dollars the first year."

It appears that Hendryx understood that Moody was trying to sell all or part of his business. Hendryx was aware that Moody was very proud of his fajitas, that his business had profited by selling them, and that Moody thought his fajitas could provide a business advantage for HEB. Viewing this testimony, and the inferences that can be drawn therefrom, in the light most favorable to the jury's verdict, we find this to be some evidence that Moody disclosed his secret process to HEB and that the disclosure was made in confidence. We also find it to be some evidence that Hendryx knew or should have known that Moody was providing the secret process in confidence.

## C. Did HEB use the secret without Moody's authorization?

█ Hendryx testified that HEB had neither purchased nor used a vacuum tumbler to premarinate fajitas before he visited with Moody in Corpus Christi. Within one month of Hendryx's visit with Moody, HEB purchased a vacuum tumbler to premarinate fajitas. Within three months of the visit, HEB sought U.S. Department of Agriculture (USDA) approval of its label for its vacuum tumbled premarinated fajitas. HEB had begun using a process to premarinate fajitas that involved beef, protein, water, vacuum tumbling, and phosphate. Through this process, HEB produced and sold millions of dollars worth of treated fajitas. Other than the purchase price for Moody's fajitas that they tested, Hendryx testified that HEB never paid Moody anything.

Gary Palmer sold food processing equipment, and had been trying to sell a vacuum tumbler to HEB for some time. It was not until one week after Hendryx's meeting with Moody, however, that HEB ordered a tumbler.

The evidence shows that HEB had been testing different marinating processes for fajitas since 1984 or 1985, but did not sell premarinated fajitas until after Hendryx's visit to Moody's store. HEB was in direct competition with Moody for the sale of fajitas to the public. Hendryx testified that he was not aware of any other fajita processor who used the same five-element process as Moody.

Moody testified that he had visited the HEB meat processing plant in San Antonio and had seen HEB using a vacuum tumbler for producing premarinated fajitas. Moody could identify the process being used by HEB by referring to the label on its fajitas.

Viewed in the light most favorable to the verdict, we find this to be some evidence that

HEB used Moody's five-element process without his authorization. The fact that HEB's process involved the same five elements as Moody's, and the fact that HEB began using this process almost immediately after Hendryx's visit with Moody, raises an inference that Hendryx informed HEB of Moody's process after he returned to San Antonio, and that HEB quickly implemented the process. It is undisputed that HEB never received Moody's consent to use the process, and that HEB never paid Moody anything for its use.

■ Because we hold that the evidence is legally sufficient to support the jury's finding that HEB misappropriated Moody's trade secret after it was communicated to HEB in confidence, we overrule the first part of HEB's first point of error.

### Factual Sufficiency of the Evidence

■ By the second part of its first point of error, HEB complains that the evidence is factually insufficient to support the jury's finding on liability. HEB contends that appellees failed to show that the marinating process was a trade secret, that it was communicated to Charles Hendryx in confidence, and that HEB used it without authorization.

When we review an "insufficient evidence" or factual sufficiency of the evidence point, we consider, weigh and examine all of the evidence which supports or undermines the jury's finding. *Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We review the evidence, keeping in mind that it is the jury's role, not ours, to judge the credibility of the evidence, to assign the weight to be given to testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony. *Corpus Christi Area Teachers Credit Union v. Hernandez*, 814 S.W.2d 195, 197 (Tex.App.—San Antonio 1991, no writ) (citations omitted). We set aside the verdict only when we find that the evidence standing alone is too weak to support the finding or that the finding is so against the overwhelming weight of the evidence that it is manifestly unjust and

clearly wrong. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

### A. Was there a trade secret?

Norman Cunningham, ADM's sales representative, testified that ADM has sold isolated soya protein for use in premarinating fajitas since 1985 or 1986. According to Cunningham, ADM developed a recipe for a 35% absorption brine for fajitas. This recipe was included in a paper written by Cunningham and presented at the 11th Annual Meat Industry Seminar at Texas A & M University in January 1988. However, the paper was written as early as two years before its presentation. ADM's recipe is as follows:

FOR A 35% ABSORPTION BRINE FOR WHOLE MUSCLE TRIM & FAJITAS

| | | |
|---|---|---|
| 1. | Cold water (39° F) | 87.75% |
| 2. | **Isolated Soya Protein** | 7.00% |
| 3. | **Sodium Phosphates** | 1.70% |
| 4. | Salt | 1.90% |
| 5. | Seasoning Blend | 1.65% |

This brine will absorb into the **meats** in approximately 20–45 minutes depending on the size of the **tumbler,** volume of the pieces, etc. (emphasis added).

Cunningham testified that the recipe was *given* to ADM customers all over the United States to encourage them to use isolated soya protein. As part of ADM's sales efforts, Cunningham would instruct businesses on how to create the absorption brine in a meat tumbler, and if a business did not have a tumbler, ADM would provide one. According to Cunningham, "[t]his is a very general formula ... used worldwide." Cunningham provided evidence that a recipe using the same ingredients in different percentages existed as early as October 1986.

ADM's recipe clearly includes the same five-element process that Moody identified as his secret.[3] Although Moody admitted that he learned about isolated soya protein from Cunningham in mid 1987, he denied that he was given the marinade recipe. That Moody did not have the recipe does not controvert Cunningham's testimony that ADM distributed copies of the recipe to its customers or that the recipe was part of the paper pre-

---

**3.** Moody does not claim that the spices are part of the process.

sented at the Meat Industry Seminar. Moody's mere claim that he was unaware of this publicly available information will not support his assertion of a trade secret. *See Wissman,* 240 S.W.2d at 280; *Numed, Inc.,* 724 S.W.2d at 435; *Arrow Chem. Corp. v. Anderson,* 386 S.W.2d 309, 312 (Tex.Civ. App.—Dallas 1965, writ ref'd n.r.e.).

Moench testified that the ingredients for Moody's fajitas were displayed at the counter where his fajitas were sold. Although Moody disputed that the ingredients were listed on the label, he did testify that the label revealed nutritional information about the fajitas. Earline Moody testified that the marinade recipe may have been included in a brochure which stayed on top of the meat counter. Moench and the Moodys did not testify that the label or brochure included information about vacuum tumbling.

Judith Quick, a former deputy director of the USDA food labeling division, examined Moody's marinating process. Quick testified that there was nothing unique about the process because each of the five elements were commonly used in meat products. She explained that it was not unusual to combine all five elements to produce premarinated fajitas. However, Quick was not aware of anyone else who used isolated soya protein in fajitas. Concerning Moody's formula, Quick stated:

> [I]f you took that formula up there on the chart and took away the fact that it was a beef skirt just beef and if you took away Moody's special seasonings and just made that seasoning you would have a generic formula for a wide variety of marinated added solution red meat products sold in the U.S. today.

Tim Bolner, of Bolner's Fiesta Products, testified that his company sold spice and seasonings to approximately fifty meat industry customers. Bolner was aware, prior to May 1989, of one customer making premarinated fajitas using a vacuum tumbler, plant protein, phosphate, water, and meat. According to Bolner, there was no secret about the process. He admitted, however, that the process was not in general use.

HEB argues that Moody's process was commonly known because it was published and widely distributed in the industry before HEB began making premarinated fajitas. After reviewing all of the evidence, we agree.

The evidence conclusively refutes Moody's testimony that his process was not generally known in the industry. Accordingly, we find the jury's finding that a trade secret existed to be so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong.

Because we hold that the evidence is factually insufficient to support the jury's finding that Moody's process was a trade secret, we sustain the second part of HEB's first point of error. We need not address appellant's remaining points of error because our decision on this point is dispositive of the case. Tex.R.App. P. 90(a).

We reverse the judgment and remand the case to the trial court for a new trial.