**Affirmed and Opinion filed October 9, 2018.**



In The

# Fourteenth Court of Appeals

## NO. 14-17-00863-CV

## KANA ENERGY SERVICES, INC., Appellant

### V.

## JIANGSU JINSHI MACHINERY GROUP CO. LTD. D/B/A JMP TECHNOLOGIES, AND HELIOS OIL & GAS EQUIPMENT LLC, Appellees

**On Appeal from the 190th District Court
Harris County, Texas
Trial Court Cause No. 2017-55123**

## O P I N I O N

In this case concerning claims, among others, of breach of fiduciary duty and misappropriation of trade secrets, appellant Kana Energy Services, Inc. appeals the trial court's denial of its application for a temporary injunction. Given the conflicting evidence, we cannot say that the trial court abused its discretion in denying the application. We accordingly affirm the trial court's ruling.

# I. Background[1]

"API-6A" is an international specification used by the American Petroleum Institute to measure the quality of equipment manufactured in different countries. Appellee Jiangsu Jinshi Machinery Group Co. Ltd. ("JMP China") manufactures API-6A oilfield equipment in China. From 2006 until 2016, JMP China's products were sold in the United States and Canada only by Wellhead Distributors International ("WDI"), a wholesale distributor with whom JMP China had an exclusive-distributorship contract.

Appellant Kana Energy Services, Inc. ("Kana") was formed in 2008, and like WDI, Kana is a wholesale distributor of API-6A oilfield equipment in the United States and Canada. Where WDI obtained its products from JMP China, Kana obtained its products Jiangsu Jinjia Drilling & Production Equipment Co., Ltd., known in the industry as "JHK."

In 2013, Kana believed that JMP China was unhappy with its exclusive-distributorship arrangement with WDI. In October of that year, Kana took one of its customers to China to meet with JMP China about the possibility of becoming JMP China's exclusive distributor in North America.

In December 2013, Kana hosted a meeting in Houston with JMP China's chairman, JHK's chairman, and a few employees of either company to discuss a joint venture in which Kana would become the exclusive distributor of JMP China's products in the United States. The meetings extended for several days, during which Kana showed JMP China and JHK a 42-page PowerPoint presentation of its plan to

---

[1] In accordance with the standard of review, we summarize the evidence in the light most favorable to the trial court's ruling. *See* Section II, *infra.*

2

market JMP China's products. Kana also introduced JMP China and JHK to some of Kana's current and potential customers.

JMP China and Kana failed to reach an agreement, but WDI sued both companies in early 2014. WDI sued JMP China for breach of contract, and in a separate suit, WDI sued Kana for tortious interference with WDI's contract with JMP China. The outcome of the two suits is not expressly stated in the record, but JMP China continued to sell its products in North America exclusively through WDI, and Kana continued to obtain its API-6A products from JHK.

When JMP China's relationship with WDI ended in 2016, JMP China began using Helios Oil & Gas Equipment, LLC ("Helios") as its distributor. Helios wanted an exclusive distributorship relationship with JMP China, but after its experience with WDI, JMP China refused. JMP China instead founded a Texas subsidiary, JMP Petroleum Technologies, Inc. ("JMP Tech"), which imports JMP China's API-6A products for sale in the United States. JMP China also continues to sell its products through Helios.

After learning of these arrangements, Kana sued Helios, JMP China, and JMP Tech.[2] Kana asserted claims against JMP China and JMP Tech for fraud, misappropriation of trade secrets, breach of contract, breach of fiduciary duty, breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose. Against JMP China, JMP Tech, and Helios, Kana asserted a claim for conspiracy to breach fiduciary duty. Kana also requested a temporary restraining order, a temporary injunction, and a permanent injunction to prevent all three companies from selling API-6A equipment

---

[2] Although Kana identified JMP Tech as an assumed name for JMP China, the two companies answered the suit separately, and we treat them as separate entities.

3

to the fourteen actual or potential Kana customers that Kana identified to JMP China and JHK during the joint-venture negotiations.

The parties agreed to a temporary restraining order preventing JMP China, JMP Tech, and Helios from initiating any new sales of API-6A equipment in the United States or using Kana's marketing plan. After expedited discovery and an evidentiary hearing, the trial court denied Kana's application for a temporary injunction. Kana challenges that ruling in this interlocutory appeal.

## II. STANDARD OF REVIEW

A temporary injunction is used to preserve the status quo of the subject matter of the litigation pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (op. on reh'g). The status quo is the last actual, peaceable, non-contested status preceding the pending controversy. *Wash. DC Party Shuttle, LLC v. IGuide Tours*, 406 S.W.3d 723, 740 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (en banc).

To obtain a temporary injunction, the applicant must plead and prove (a) a cause of action against the defendant, (b) a probable right to the relief sought, and (c) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204. In three corresponding issues, Kana contends that it established each of these three elements.

We review the trial court's ruling for clear abuse of discretion. *Davis v. Huey*, 571 S.W.2d 859, 861–62 (Tex. 1978). When reviewing the record for abuse of discretion, we consider the evidence in the light most favorable to the trial court's ruling and draw all legitimate inferences in support of it. *See Wash. DC Party Shuttle*, 406 S.W.3d at 740. On appeal, the party challenging the trial court's ruling must establish that, with respect to the resolution of factual issues, the trial court

4

reasonably could have reached but one decision. *Id.* (citing *N. Cypress Med. Ctr. Operating Co. v. St. Laurent*, 296 S.W.3d 171, 175 (Tex. App.—Houston [14th Dist.] 2009, no pet.)). If the facts are established, a trial court abuses its discretion if it misapplies the law to those facts. *N. Cypress Med. Ctr.*, 296 S.W.3d at 175. A trial court does not abuse its discretion if its decision is based on conflicting evidence. *Davis*, 571 S.W.2d at 862.

### III. BREACH OF FIDUCIARY DUTY

In its opening brief, Kana argues that it pleaded and proved a cause of action for breach of fiduciary duty. We disagree. There are two kinds of fiduciary relationships—formal and informal—but Kana does not contend on appeal that it has either type of relationship with JMP China.

Fiduciary duties arise in certain formal relationships, such as the relationship between an attorney and a client. *Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex. 2005) (per curiam). Joint venturers have such a formal fiduciary relationship. *See Rankin v. Naftalis*, 557 S.W.2d 940, 944 (Tex. 1977); *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.*, 217 S.W.3d 653, 668 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). Although Kana argued in the trial court that it had a joint-venture relationship with JMP China beginning in December 2013, it has abandoned those arguments on appeal, affirmatively asserting that the existence of such a relationship is "immaterial" to the issues presented. Moreover, Kana's corporate representative admitted at the evidentiary hearing that Kana has no written joint-venture agreement with JMP China. Viewed in the light most favorable to the trial court's ruling, the evidence supports the trial court's implied finding that Kana and JMP China were not joint venturers.

Kana nevertheless contends that it has a "confidential relationship" with JMP China. In the context of a breach-of-fiduciary-duty claim, a "confidential

5

relationship" also is known as an informal fiduciary relationship. An informal fiduciary relationship "arises from 'a moral, social, domestic or purely personal relationship of trust and confidence.'" *Meyer*, 167 S.W.3d at 331 (quoting *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998)). Informal fiduciary duties arise in a business transaction only if the special relationship of trust and confidence arose prior to, and apart from, the agreement that is the subject of the suit. *Id.* Kana neither alleged nor offered evidence of such a preexisting relationship of trust and confidence between it and JMP China. To the contrary, Kana affirmatively states on appeal that it does not assert the existence of such a preexisting relationship.

Because Kana does not contend that it has a formal or informal fiduciary relationship with JMP China, the trial court did not abuse its discretion in failing to grant Kana a temporary injunction based on a cause of action for breach of fiduciary duty.

## IV. MISAPPROPRIATION OF TRADE SECRETS

Although Kana refers to the cause of action at issue as breach of fiduciary duty, its arguments and authorities actually pertain to a different cause of action: misappropriation of trade secrets.[3] The source of the confusion appears from the use

---

[3] The Texas Uniform Trade Secrets Act "applies to the misappropriation of a trade secret made on or after" the Act's effective date of September 1, 2013. Act of Apr. 23, 2013, 83d Leg., ch. 10, §§ 3, 4, 2013 TEX. GEN. LAWS 12, 14. The Act "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." TEX. CIV. PRAC. & REM. CODE ANN. § 134A.007(a) (West Supp. 2018). Kana alleges that JMP China misappropriated Kana's trade secrets on and after December 2013 but has briefed only a common-law trade-secrets claim. Assuming, without deciding, that the Act provides more protection than the common law in certain areas and less in others (either of which would result in the Act displacing the common-law claim), that would not change our decision. In any areas where the Act may provide more protection, Kana waived it for the purpose of obtaining a temporary injunction by failing to brief the issue in the trial court or on appeal. In areas where the Act

of the same phrase—"confidential relationship"—in both causes of action, but with different meanings and implications.

As used in fiduciary-duty cases, "confidential" in the phrase "confidential relationship" refers to the "close personal relationship of trust and confidence" that one party has reposed in another. *Willis v. Donnelly*, 199 S.W.3d 262, 277 (Tex. 2006). As used in a claim for misappropriation of trade secrets, on the other hand, "confidential relationship" means a relationship in which the owner of a trade secret discloses it "in confidence so as to place the other party under a duty to keep his secret." *Furr's Inc. v. United Specialty Adver. Co.*, 385 S.W.2d 456, 459 (Tex. Civ. App.—El Paso 1964, writ ref'd n.r.e.). For example, one who has access to a trade secret pursuant to a license stands in a confidential relationship with the licensor. *See Hyde Corp. v. Huffines*, 314 S.W.2d 763, 768 (Tex. 1958), *cert. denied*, 358 U.S. 898 (1958). Employers and employees have a confidential relationship in which the employee is given access to trade secrets only in furtherance of the employer's business. *See, e.g.*, *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 86–87 (Tex. App.—Houston [14th Dist.] 1996, writ denied).

Despite Kana's references to breach of fiduciary duty, we understand from Kana's arguments and authorities that it uses the expression "confidential relationship" in reference to its claim for misappropriation of trade secrets,[4] for as the Supreme Court of Texas explained in *Hyde*,

---

provides less protection, any error in failing to apply the Act is harmless because Kana cannot prevail on appeal even under the common law for the reasons we explain.

[4] Although misappropriation of trade secrets is not listed in the "Legal Causes of Action" section of Kana's petition, it is mentioned in the opening paragraph and in the "Facts" section of the pleading. *See Kopplow Dev., Inc. v. City of San Antonio*, 399 S.W.3d 532, 536 (Tex. 2013) ("[A] petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim." (quoting *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982)).

7

"One who discloses or uses another's trade secrets, without a privilege to do so, is liable to the other if (a) he discovers the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him. . . . ."[5] [I]t matters not whether the suit be designated as a 'trade secret' case or as a suit for breach of confidence . . . .[6]

In its first issue, Kana contends that the trial court erred in denying Kana's application for a temporary injunction based on its implied finding "that Kana did not plead a cause of action supporting a confidential relationship and a fiduciary duty between Kana and JMP [China]." We conclude that Kana did plead a cause of action for misappropriation of trade secrets, including facts supporting the existence of a confidential relationship; however, to obtain a temporary injunction, the applicant must "plead *and prove*" a cause of action against the defendant and a probable right to the relief sought. *Butnaru*, 84 S.W.3d at 204 (emphasis added). To prevail on a common-law trade-secret claim at trial, Kana will have to establish (a) Kana's ownership of a trade secret; (b) JMP China's breach of a "confidential relationship" or its discovery of Kana's trade secret through improper means; (c) JMP China's use or disclosure of the trade secret without Kana's authorization; and (d) resulting damages to Kana. *See Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Servs., LLC*, 404 S.W.3d 737, 744 (Tex. App.—El Paso 2013, no pet.). For the reasons addressed below, the trial court reasonably could have found on this record that Kana failed to prove a cause of action against JMP China and thus, failed to establish a probable right to the relief sought.

---

[5] *Hyde*, 314 S.W.2d at 769 (quoting RESTATEMENT OF TORTS § 757 (1939)).

[6] *Id.* at 777 (op. on denial of reh'g).

## A. Existence of a Confidential Relationship Between Kana and JMP China

As used in a claim for misappropriation of trade secrets, a "confidential relationship" may exist when the disclosing party reveals a trade secret to allow the recipient of the information to assess a proposed business arrangement or transaction, and the recipient either (a) expressly promises to keep the information confidential; or (b) receives the information under circumstances that justify a conclusion that the recipient knows or has reason to know that the disclosure is intended to be in confidence, and the disclosing party reasonably infers that the recipient has consented to keep the information confidential. *See Eagle Oil & Gas Co. v. Shale Exploration, LLC*, 549 S.W.3d 256, 272 (Tex. App.—Houston [1st Dist.] 2018, no pet. h.) (citing RESTATEMENT OF TORTS § 757 cmt. (j) (1939) and RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 41 (1995)).[7]

Although Kana maintained in the trial court that it had a fiduciary relationship with JMP China as co-adventurers, a "confidential relationship" may exist outside a formal fiduciary relationship for the purpose of a trade-secret claim. *See Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 729 (Tex. 2016) (referring to fiduciary relationships and "other types of confidential relationships"). Kana pleaded in the trial court and contends on appeal that it entered into a confidential relationship by disclosing trade secrets to JMP China during and after the December 2013 negotiations for the proposed joint venture.

In *Hyde*, the Supreme Court of Texas referred in dicta to a similar scenario. In that case, the court emphasized that the plaintiff revealed trade-secret information to the defendant not only as part of a license agreement, but during the course of

---

[7] "The original Restatement's section 757 has been omitted from the Restatement (Second) of Torts and incorporated into the Restatement (Third) of Unfair Competition." *In re Bass*, 113 S.W.3d 735, 739–40 (Tex. 2003) (orig. proceeding).

negotiating the agreement. *Hyde*, 314 S.W.2d at 768 (licensee gained knowledge of the device "as a result of this agreement and the negotiations preceding its execution"); *id.* at 769 (access to information was "granted as a result of contract negotiations" as well as later disclosures); *id.* (defendant "secured information which enabled him to manufacture the device through the licensing agreement and the negotiations relating thereto"). Because the negotiations culminated in a licensing agreement, the court was "not called upon to consider at what period in the course of negotiations [the defendant's commercial use of the plaintiff's information] may have ceased to be ethically permissible." *Id.* But in dicta, the court identified analogous examples of circumstances under which a duty of confidentiality may exist:

> For example, A has a trade secret which he wishes to sell with or without his business. B is a prospective purchaser. In the course of negotiations, A discloses the secret to B solely for the purpose of enabling him to appraise its value. Or, A requests a loan from B, a banker, for the purpose of aiding the manufacture of a product by A's secret process. In order to assure B about the soundness of the loan, A discloses the secret to him in confidence. In both cases B is under a duty not to disclose the secret or use it adversely to A.

*Id.* at 770 (quoting RESTATEMENT OF TORTS, § 757 (1939), cmt. j to clause (b)).

Citing these examples, the Thirteenth Court of Appeals determined that a disclosure was made pursuant to a confidential relationship when a seller of pre-marinated fajitas disclosed its marination process to a grocery chain as part of the negotiations for the sale of the business or the alleged trade secret. *See H.E. Butt Grocery Co. v. Moody's Quality Meats, Inc.*, 951 S.W.2d 33 (Tex. App.—Corpus Christi 1997, pet. denied). In that case, the seller did not state that the process was confidential, and rather than buying the business or the alleged trade secret, the grocery chain began selling pre-marinated fajitas using the same process the seller described. *See id.* at 36–37. Nevertheless, the court concluded that a confidential

10

relationship existed because the grocery chain knew that the seller was trying to sell all or part of his business; that the seller's business had profited from the sale of pre-marinated fajitas; and that the seller thought the grocery chain could enjoy a business advantage by selling pre-marinated fajitas using the same process. *See id.* at 37. Because the seller disclosed its alleged trade secret in confidence and the grocery chain knew or should have known that, the court held the evidence sufficient to support the existence of a confidential disclosure—or as commonly stated, a confidential relationship.

The evidence in this case shows similar indicia of a confidential relationship. Kana produced evidence that the December 2013 meeting was part of its negotiations for a joint venture with JMP China. Gary Taylor, Kana's vice president in charge of sales and marketing, testified without contradiction that he informed JMP China at the meeting that its marketing PowerPoint was confidential, and that he asked anyone who was not willing to keep the information confidential to leave the meeting. No one did so. For the purpose of this appeal, we can assume, without deciding, that in December 2013, Kana began to negotiate entering into a joint venture with JMP China and that JMP China had reason to know, and Kana reasonably inferred, that any trade secrets Kana disclosed to JMP China during the course of the negotiations would remain confidential. *See Hyde*, 314 S.W.2d at 770; *Eagle Oil*, 549 S.W.3d at 272.

But, even assuming the existence of a confidential relationship, we must affirm unless the trial court's ruling is contrary to the only reasonable view of the evidence on the other elements of the misappropriation claim. *See Wash. DC Party Shuttle*, 406 S.W.3d at 740. As discussed below, there is conflicting evidence about whether certain information was shared with JMP China, whether information that was shared was Kana's trade secret, and whether JMP China has used or disclosed

11

a Kana trade secret as Kana alleges. Because there is conflicting evidence on these elements of Kana's claim for misappropriation of trade secrets, the trial court did not abuse its discretion in denying Kana's application for a temporary injunction.

**B. Conflicting Evidence that JMP China Possessed, Used, or Disclosed Kana Trade Secrets**

A "trade secret" is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Hyde*, 314 S.W.2d at 776 (quoting RESTATEMENT OF TORTS § 757, cmt. b (1939)). Trade secrets may include customer lists, customer contact information, pricing information, and market strategies. *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 424 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Kana alleges that it has shared, or that JMP China has used or disclosed, each of these categories of information, as well as information about a customer's indebtedness and about Kana's product numbers.

### 1. Customer Lists

Kana alleges that in December 2013 it identified fourteen of its customers to JMP China. We cannot precisely identify these customers. The records filed under seal include Kana's marketing materials presented at the meeting, and these materials include the names of nine of Kana's then-current customers and five additional companies that Kana intended to target. We cannot be sure that these are the customers to which Kana refers because when witnesses at the hearing were given a list of the fourteen customers to whom Kana seeks to enjoin JMP China's sales and asked which companies on the list they had contacted before December 2013, these witnesses identified companies that are not named in Kana's marketing materials.

In any event, some of Kana's contentions are self-defeating. For example, Kana contends that it introduced JMP China to "a company named Sunbelt, which was at the time (unknown to JMP) their largest U.S. customer through [WDI]." But WDI was Kana's competitor in the distribution of API-6A products. If the identity of a distributor's customers were a trade secret as Kana contends, then how could Kana know the identity of its competitor's largest purchaser of JMP China's products? If the customers for JMP China's products were a trade secret, then it would be a trade secret belonging not to Kana but to WDI.

There is ample evidence, however, that the names of buyers of API-6A products are not secret. Kana's founder and president Gavin Liu admitted that "[e]verybody can log on [the] Internet to find—find out the company names." He added that to do business with a company, one has to "develop a personal relation[ship]" with a contact at the company. But, JMP China sells its products in North America through Helios and JMP Tech, and there is evidence that employees of these companies had contacted most of the companies at issue before Kana disclosed them in 2013.

For example, Guangyuan "Robert" Xiong is the founder of Helios and the president of JMP Tech. Xiong formerly was the United States director for a different Chinese API-6A manufacturer, and in that capacity, he had established his own contacts among North American companies that buy API-6A products. When shown the list of Kana's fourteen actual or potential customers and asked which of the companies he'd contacted during his previous employment, Xiong named ten companies. He also explained that no one had taught him how to identify customers, and that he'd simply cold-called customers he identified from an internet search. He stated that JMP China did not tell him which companies to solicit as customers; to the contrary, he told JMP China which companies would be targeted.

13

Similarly, Mark Huston, JMP Tech's regional sales manager, testified that he has worked in the industry off and on since 1979. He testified that he'd previously been in contact with at least seven companies on the list, including three of the companies that were on the list of customers that Kana introduced to JMP China in December 2013. Huston also listed a number of personal contacts at these companies, including Kana's only "personal contact" identified by name at the hearing. In addition, Kana supported its application for a temporary injunction with an affidavit from Kana sales representative David Davila, who attested that a former employee of WDI is a sales representative for "JMP." Kana, too, employs a former WDI employee as its vice president in charge of sales and marketing. Because WDI was JMP China's exclusive distributor for at least ten years before JMP China began selling its products through Helios and JMP Tech, a former employee of WDI would be familiar with the market for JMP China's products—whether employed by Kana, JMP China, Helios, or JMP Tech.

On this record, the trial court reasonably could conclude that a list of past consumers and potential future customers for JMP China's products was not Kana's trade secret. *See also Allan J. Richardson & Assocs., Inc. v. Andrews*, 718 S.W.2d 833, 837 (Tex. App.—Houston [14th Dist.] 1986, no writ) (holding evidence sufficient to support the trial court's implied finding that applicant's client list was not a trade secret where witness testified that names of actual or potential clients are readily available to the general public or by asking potential customers which companies they have done business with).

### 2. *Customer Contact Information and Pricing from Purchase Orders and Price Quotations*

Kana also asserts that after December 2013, it shared with JMP China certain purchase orders from, or price quotations to, Kana's customers, and that these documents contained trade secrets such as the customer's contact information and

the price at which Kana was selling API-6A products. But, Kana maintained at the hearing that JMP China includes not only that company, but all of JMP China's affiliates and "any subsidiary in which it owns stock," so arguments that Kana sent purchase orders and price quotations to "JMP" do not indicate whether Kana sent these materials to JMP China or to a different company. Indeed, Kana's corporate representative testified that the purchase orders were sent to JHK "[e]very time." The emails discussing these documents do not appear to include a JMP China email address, and JMP China's sales manager Liu Xiang "Andy" Jun denied receiving purchase orders from Kana. Kana's own purchase orders identify its vendor as JHK.

Given the state of the record, the trial court reasonably could find that Kana failed to show that it shared this information with JMP China.

### 3. *Marketing Strategies*

Kana also alleges that JMP China has used or disclosed, or presumably will use or disclose, the 42-page marketing strategy that Kana presented at the December 2013 meeting. Kana's two-pronged marketing strategy called for JMP China to sell its products (a) through a distributor in a "marketing channel," a method that Kana sometimes referred to as "just-in-time inventory" or U.S. "direct sales"; and (b) directly to customers, a marketing channel that Kana referred to as "China Direct." Kana's president admits that neither of these concepts are original, but that the way Kana proposed to implement them was new.

Given Kana's contention that its proposed implementation of these two marketing strategies is a trade secret, we will not describe them in further detail; however, we have reviewed the record, including the marketing materials filed under seal, and we conclude that the trial court did not abuse its discretion in declining to extend trade-secret protection to either of Kana's marketing strategies pending a trial on the merits.

15

### 4. *Customer Indebtedness*

Kana's corporate representative testified about an exhibit that Kana's counsel represented to be an April 2017 email from Robert Xiong to Helios employee John Holland. Although the email was admitted as an exhibit, it is not in the record before us; however, the record contains testimony about the email's contents. According to Kana's corporate representative, Xiong wrote, "I heard from Johnny that [Kana Customer] still owes Kana [amount], that it has been a longtime debt." "Johnny" was said to be Johnny Yin, the current chairperson of JMP China.

This email is dated four years after the meeting at which Kana allegedly shared confidential information. Although Kana contends the customer's debt is Kana's trade secret, there is no evidence that Kana ever shared this information with JMP China, and Kana does not argue that the customer was prohibited from disclosing information about its own debt. Moreover, the 2017 email purportedly states that Kana "still" owes the debt, which suggests that JMP China was relating current information rather than information learned from Kana years earlier.

On this record, the trial court reasonably could find that Kana failed to show that the email contains an unauthorized disclosure of a trade secret that Kana revealed to JMP China as part of a confidential relationship.

### 5. *Product Numbers*

Kana's Gavin Liu testified that JMP China must be disclosing Kana's trade secrets because Helios was using Kana product numbers that Helios could have obtained only from JMP China. As evidence of this, Gavin relied on a comparison of product price quotes by Helios containing some product numbers in the form "J-K-##-#####," and purchase orders from Kana to JHK having product numbers in the form "K-##-#####," with both Kana and Helios completing the product number

16

with the same numerals for a given product. According to Kana, this is evidence that Helios is using Kana's product numbers and simply adding "J-" to the beginning.

Mark Huston of JMP Tech, however, testified that product numbers are not a trade secret, but are like a product's bar code, and generally are marked directly on the product. Liu agreed that the manufacturer marks the product number on the product, although he added that some products were marked with two product numbers. He also admitted that Kana did not create these numbers but obtained them from "JMP." Liu further admitted having previously testified that Kana actually bought its products from JHK. Moreover, Kana's evidence includes a September 2014 product delivery schedule that Kana admittedly obtained from JHK and that uses the product numbers of the same format that Kana claims is its trade secret. From this, the trial court reasonably could find that "Kana's product numbers" are actually the product numbers that manufacturer JHK marked on its own products, and that the product numbers using a slightly different format in Helios's price quote are the product numbers that JMP China marks on its products.

For all of the foregoing reasons, we conclude that the trial court did not abuse its discretion in impliedly finding that Kana failed to satisfy its burden to (a) prove a cause of action for misappropriation of trade secrets, or (b) establish a probable right to relief. We overrule Kana's first two issues.

## C.    Probable, Imminent, Irreparable Injury

In its third issue, Kana argues that we can infer from JMP China's possession of Kana's trade secrets that Kana will suffer irreparable injury if JMP China uses or discloses them. In light of our disposition of Kana's first two issues, we do not reach its third issue.

## V. CONCLUSION

Given the conflicting evidence, we cannot conclude that the trial court could have reached but one result. Finding no abuse of discretion, we affirm the trial court's ruling.


/s/    Tracy Christopher
Justice


Panel consists of Justices Boyce, Christopher, and Busby.